[L. A. No. 5707. In Bank.—February 15, 1921.]

## THE WEINBERG COMPANY (a Corporation), Respondent, v. GEORGE H. BIXBY et al., Appellants.

[1] WATERS AND WATER RIGHTS—CONSTRUCTION OF EMBANKMENTS—PROTECTION OF LANDS FROM FLOOD WATERS — JOINT ENTERPRISE.—Where, in the construction of a line of embankment and the deepening of the eroded channel of the river for the protection of lands on one bank from flood waters, it was necessary in extending the work to carry it over lands belonging to another on the other side of the river, and the latter consented to the use of his land, for the protection of his property provided the former would construct a like embankment on his side of the river, the construction of the two embankments was in a sense a joint enterprise, although separately owned, and both owners became jointly liable for any damages proximately resulting from a negligent or wrongful performance of the work.

[2] ID.—PROTECTION AGAINST FLOOD WATERS—RIGHT OF LAND OWNERS —ADOPTION OF COMMON-LAW RULE.—The doctrine of the common law relating to protection against flood overflow of rivers, and which has been adopted by the courts of this state, recognizes such flood waters as a common enemy which may be guarded against or warded off by one whose property is invaded or threatened, by obstructions which are merely defensive in their nature and not calculated to interfere with the current of the water in its natural channel.

[3] ID.—UNDERLYING PRINCIPLE OF DECISIONS.—The underlying principle governing the decisions of the supreme court which deal with extraordinary water conditions, whether created by the ocean or by unexpected and unprecedented floods, is that in such stress the land owner may use every reasonable precaution to avert injury from his land, and whether or not his conduct be reasonable will be determined by existing conditions and not by after consequences; so that if the acts of the land owner be, in the light of the existing circumstances, not unreasonable, he will not be held liable for consequent damage which by these reasonable acts may be inflicted upon another land owner.

[4] ID.—SURFACE WATERS—ADOPTION OF RULE OF CIVIL LAW.—The distinction is recognized in this state between the flood waters of a natural watercourse and the surface drainage arising from rain

---

2. Right of one riparian owner as against other riparian owners to confine flood water within bank of stream, notes, 14 **Ann. Cas.** 718; 24 **L. R. A.** (N. S.) 214.

or melting snow, or springs and swamps before they have found their way to and become a part of a stream or river, and as to such drainage the courts have adopted the rule of the civil law which places upon the proprietor of the land the burden of permitting the passage over his land of the surface drainage in such a way as not to retard its flow from the lands above him, nor to concentrate and increase this flow upon the land below.

[5] ID.—OVERFLOW WATERS OF LOS ANGELES RIVER—FLOOD WATERS.—- The overflow waters of the Los Angeles River spreading from the channels of the stream over the adjacent country and accompanying the channel waters in a parallel course to the sea are flood waters and subject to the doctrine of flood and not surface waters.

[6] ID.—PROTECTION OF LANDS—WHEN NOT WRONGFUL.—The construction by land owners of dikes along and parallel with the banks of the Los Angeles River and the mere deepening of the river channel along its natural course for the protection of the lands on one or the other banks of the river are not wrongful acts so long as they do not obstruct the natural flow of the stream or divert its course, even though the effect upon the channel of the stream below, by reason of increased flow and current between the embankments, is to silt and obstruct the lower channel.

[7] ID.—MAINTENANCE OF OBSTRUCTIONS—ABSENCE OF OBLIGATION.— The fact that a land owner avails himself of the right to repel vagrant waters of a river by embankments does not, in the absence of some further circumstances or set of circumstances, impose upon him any obligation to maintain such obstruction, or to refrain from restoring natural conditions.

[8] ID.—PROTECTION OF LANDS FROM OVERFLOW — REOPENING OF OLD OUTLET OF RIVER CHANNEL—INCREASED FLOW—NONLIABILITY FOR DAMAGE.—Land owners who constructed embankments, dredged the river channel and restored the old outlet, which had been obstructed, to protect their lands from flood waters, were not liable for damages from increased flow through such outlet as the result of accumulation of silt in the channel below caused by the construction of dikes above, since such result could not have been reasonably contemplated.

[9] ID.—ACCUMULATION OF SILT FROM PROTECTION AGAINST FLOOD WATERS—NONLIABILITY OF OWNER.—A land owner in the construction of embankments and dredging of a river channel for the protection of his land from flood waters is not accountable for the disposition of the water or the silt and debris it carries at points below.

[10] ID.—REOPENING OF OUTLET OF RIVER CHANNEL—JOINT LIABILITY. Where a land owner to protect his land from the flood waters of a river and to protect the land of another for whom he was the

active agent reopened the old outlet of the river, the owner of such other land was jointly responsible with him for damages which resulted from an unnatural increase of flood waters through such opening, notwithstanding such other owner had no actual knowledge of the physical conditions or probable consequences of the opening, and that neither of the parties was actuated by any thought of wrongdoing.

[11] ID.—ACTION FOR DAMAGES — UNLAWFUL DIVERSION OF FLOOD WATERS — PLEADING — MISJOINDER OF PARTIES — MISJOINDER OF CAUSES OF ACTION.—The joinder of a cause of action against an electric railroad company for damages resulting from the construction and maintenance of embankments and trestles across the channel of a river during the year 1901 in such a way as to interfere with and divert the natural flow of the river upon plaintiff's land to its damage, with a cause of action against other land owners for constructing in 1913 embankments along the banks of the river and dredging and deepening the channel, and in afterward cutting an opening in such embankments in such fashion as to wrongfully divert the waters of the river from their natural course upon plaintiff's lands, thereby washing and eroding them, constitutes a misjoinder of parties defendant, and of independent and unrelated causes of action.

[12] JOINT TORT-FEASORS — WHAT CONSTITUTES.— The condition of joint tort-feasors is that there must be a concert of action, a unity of purpose or design, and two or more persons working separately but to a common purpose and each acting with the knowledge and consent of the others.

[13] WATERS AND WATER RIGHTS — INSTRUCTIONS — FAILURE TO DISCRIMINATE BETWEEN FLOOD AND SURFACE WATERS.— Instructions which fail to discriminate between the rights of land owners to protect themselves against flood waters and their rights as to the diversion of surface waters are erroneous.

[14] ID.— RIPARIAN OWNER— PROTECTION AGAINST FLOOD WATERS — LOCATION OF EMBANKMENTS.—An owner of land riparian to a river is not required in the protection of his land from overflow to construct embankments along the entire length of his land, but has the right to construct the same at any point on his premises and by any means that do not go beyond the limits of a defensive act and become an aggressive diversion of the natural flow upon other proprietors.

APPEAL from a judgment of the Superior Court of Los Angeles County. Grant Jackson, Judge. Reversed.

The facts are stated in the opinion of the court.

H. C. Beach, Hunsaker, Britt & Edwards, Hunsaker, Britt & Cosgrove, Roy V. Reppy, Henry J. Stevens, O'Melveny, Millikin & Tuller and O'Melveny, Stevens & Millikin for Appellants.

Haas & Dunnigan, Veitch & Richardson, Andrews, Toland & Andrews and Arthur L. Veitch for Respondent.

SLOANE, J.—This appeal is from a verdict and judgment awarding damages for alleged wrongful diversion of the flood waters of the Los Angeles River upon plaintiff's lands.

The Pacific Electric Company, a railway corporation, the Dominguez Estate Company, a private corporation, and George H. Bixby and Amelia M. Bixby, who are husband and wife, were joined as parties defendant.

The Pacific Electric Company was exonerated from liability by the jury, and verdict and judgment were against the other defendants, appellants here, as joint tort-feasors.

The defendant Dominguez Estate Company was the owner of farming lands on the westerly banks of the river and defendant George H. Bixby, and later his wife, the defendant Amelia M. Bixby, was the owner of farming lands on the easterly side of the river at and in the vicinity of the place where the alleged wrongful diversion and interference with the river channel occurred. The Pacific Electric Company was the owner of a right of way and an electric railroad with embankments and trestles across the river valley, and particularly of a trestle which it had constructed over the natural channel of the Los Angeles River above and in the immediate vicinity of the diversion works charged to the other defendants.

It is alleged in the complaint that the location and construction of the railroad embankments and trestle were such as to concentrate the waters of the river in time of floods at this point and that the other defendants by the construction of embankments from this trestle downstream and along and on each side of the river-bed, and by dredging and deepening the channel of the stream between such embankments, so increased the current and flow of the river as to silt up and fill the natural bed of the stream below, thereby causing the waters to spread to each side, and that, in order to relieve this condition of overflow, they thereafter

cut an opening in the easterly embankment above the silted fill, thereby turning the current of the river from its former and natural course into a new channel, and that in recurring floods covering a period of two or three years great volumes of water were thus turned into this new channel and flowed down and across plaintiff's lands below, cutting, eroding, and silting them to the damage of plaintiffs.

For an intelligent understanding of the points involved on this appeal it is necessary to describe generally the topography of the country forming the watershed of the Los Angeles River. The river with its various tributaries has its source in the Sierra Madre Mountain range lying to the north of the city of Los Angeles. These branches converge in the northerly part of the city where a comparatively narrow pass exists between the highlands. From this point the river runs in a generally southerly direction through a constantly widening plain and empties into the ocean between the cities of Long Beach and San Pedro. For several miles above its outlet the river bottom is near the sea level and has a very moderate slope toward the south. To the east of the watershed of the Los Angeles River is another watershed having its source in the same mountain range and draining its waters into what is known as the San Gabriel River. Toward the ocean the course of this stream is through a valley which widens out and merges on the west into the territory through which the Los Angeles River flows. The outlet of the San Gabriel River into the ocean through a period of its history has been east of the city of Long Beach and beyond the mesa lands in the vicinity of that city. The result is that in time of excessive floods the whole territory through which the two rivers flow, for a distance of some miles back from the coast, becomes a vast lake, the waters of the two streams commingling and moving toward the ocean with a very moderate current, which, of course, is accelerated in the deeper channels where the water is accustomed to run when the rivers are within their banks. At such times of overflow the higher body of land in the vicinity of Long Beach and extending back from the coast three or four miles stands above the flood waters as an island, and serves to separate the outlets to the ocean of the two rivers. At the northwesterly end of this body of mesa land a point juts out into the valley near the place where

the defendants constructed their dikes or embankments, and also forms an abutment for the southeasterly end of the railroad trestle of the Pacific Electric Company. The line of road of the Electric Company extends from this point in a northwesterly direction across the river bottom to a projecting point of mesa lands on the opposite side called the Dominguez hills. The valley above and below these points immediately widens, both to the east and the west, but more particularly on the eastern and northern side where it extends toward the San Gabriel watershed.

The construction of the Electric Company's railroad across this space from hill to hill, which is frequently called the Narrows, consists of an embankment several feet in height, intersected by a number of trestles or bridges at places of natural depression in the floor of the valley. The principal trestle is the one at the southeasterly end. This is about one thousand feet in length, consisting of stringers and rails, resting upon bents composed of piles driven into the ground, and braced with cross-timbers. The bents were placed about twenty feet apart and at right angles with the track.

The main channel of the Los Angeles River passes under this trestle in a slightly southwesterly direction at this point. At the time of and prior to the events upon which this action is based, the natural bed or channel of the river was a shallow erosion through the comparatively level floor of the valley not generally exceeding two or three feet in depth, and from one to two hundred feet wide. Nearly every winter season the flow of the waters greatly exceeds the capacity of this channel and spreads over the adjacent land, and occasionally there occur floods which cover the valley from mesa to mesa, with only infrequent spots of slightly higher land appearing above the surface.

The railroad embankments and trestles referred to were constructed by the Pacific Electric Company in the year 1901. The diking and dredging along the river channel by others of the defendants occurred in the fall and spring of 1912–13. This latter work originated with the Dominguez Estate Company. It owned lands bordering the westerly bank of the river, and was also in some way interested in a subsidiary company that was maintaining a cement water ditch which extended under this trestle from the north on the westerly side of the river. The construction of a line

of embankment along the west bank of the river and the deepening of the eroded channel, from a point some distance north of the trestle, was designed to protect their lands and this water ditch from overflow of the flood waters. In extending this work south from the trestle it was necessary to carry it over lands belonging to the defendant George H. Bixby. He consented to such use of his land provided that for the protection of his property the Dominguez Company would construct a like embankment on his side of the river from the natural high ground at the southerly end of the trestle, and carry the work on both sides of the river, farther south than it had planned, to a point where the river-bed divided into two channels. To this extent these two defendants joined in this work of flood protection. So far as involved in this suit the west embankment was constructed by the Dominguez Company for its own benefit, but with the consent of Bixby. The eastern embankment was constructed by the Dominguez Company for the benefit of Bixby on his land and at his request, and in consideration of his consent to the use of his land for a portion of the Dominguez Company's work. **[1]** While each of these defendants separately owned and were the sole beneficiaries of the structure on their respective sides of the stream, it may properly be held that it was in a sense a joint enterprise, and that they became jointly liable for any damages proximately resulting from a negligent or wrongful performance of the work, and they were properly joined as defendants in the action.

It does not appear from the evidence, however, that the dredging and diking of the river channel was negligent or wrongful, or that any of the damage suffered by plaintiff proximately resulted therefrom. The complaint alleges, and the proof indicates, an entirely independent intervening cause, namely, the cutting of a channel through the easterly embankment by the defendant Amelia M. Bixby after she had succeeded to the interest of defendant George H. Bixby in the premises. This opening in the embankment occurred after the channel below where the cut was made had become silted and obstructed, and the stream was by reason of such obstruction of the river-bed and cut in the embankment, diverted into a new channel and across the lands of plaintiff. It is not contended, and in any event not shown by

the evidence, that the lands of plaintiff would have been injured by the defendant's dikes and dredging if the easterly dike had remained intact. Had such condition continued the waters of the river would either have forced their way through the silted channel and proceeded on their established course or would have been diverted through the breaks that occurred by the action of the flood in the westerly dikes and flowed westerly over the Dominguez property, as the evidence shows actually happened with the greater volume of the flood.

Moreover, as we have stated, the work of diking and dredging was not wrongful or negligent. The appellants here were in no way responsible, individually or collectively, for the physical conditions which at the time existed along the course of the river channel. The embankments and trestles of the Pacific Electric road had been constructed over ten years before, without their co-operation or connivance. They did not connect their work of flood protection in any way with the railroad structure in order to avail themselves of any obstruction it might offer to the natural flow of the stream. Their westerly dikes commenced at a point considerably north of the trestle, followed along the westerly bank of the river, outside the channel, under the trestle, at a point some four hundred feet from the railroad fill at the northerly end of the opening, and continued south along the westerly river bank. The evidence presents some conflict as to whether some pile sheeting on the face of the dike under the trestle was attached to the trestle bents or to independent piling put in by appellants; but that is an immaterial matter. The dikes thrown up by appellants presented no different obstruction to the current of the stream than it would have done had the trestle not been there. The appellants merely accepted the conditions that were thrust upon them and constructed this dike to prevent the flooding of their lands. On the easterly side of the river, as we understand the evidence, the dike did not pass under the trestle to the north, but commenced with the natural projection of the mesa against which the southerly end of the trestle abutted. The embankments at no place invaded the channel but ran parallel to it, and the dredging was in the eroded bed of the stream.

[2]  The doctrine of the common law relating to protection against flood overflow of rivers, and which has been adopted by the California courts, recognizes such flood waters as a common enemy which may be guarded against or warded off by one whose property is invaded or threatened, by obstructions which are merely defensive in their nature and not calculated to interfere with the current of the water in its natural channel.

The rule as stated in *Rex* v. *Commissioners,* 8 B. & C. 355, and which has been often quoted with approval by this court, declares that the sea "is a common enemy," and that any proprietor of land exposed to the inroads of the sea may protect himself by erecting a groyne or other reasonable defense, although it may render it necessary for the owner of the adjoining land to do the like, and that "each land owner for himself . . . may erect such defenses for the land under his care as the necessity of the case requires, leaving it to others, in like manner, to protect themselves against the common enemy."  Bailey, J., concurring in this opinion, says: "I am entirely of the same opinion.  It seems to me that every land owner exposed to the inroads of the sea has the right to protect himself and is justified in making and erecting such works as are necessary for that purpose."

This rule has been so often cited, approved, and commented upon by the supreme court of this state as applied to dikes and embankments by property owners to prevent overflow of their lands by the flood waters of the Sacramento River and similar streams of this state, even though the result of such obstruction has been to throw an increased volume of the flood upon opposite or lower proprietors, that it is not necessary to review the decisions at length.  (*Lamb* v. *Reclamation Dist.,* 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625]; *McDaniel* v. *Cummings,* 83 Cal. 515, [8 L. R. A. 575, 23 Pac. 795]; *Gray* v. *McWilliams,* 98 Cal. 157, [35 Am. St. Rep. 163, 21 L. R. A. 593, 32 Pac. 976]; *Sanguinetti* v. *Pock,* 136 Cal. 466, [89 Am. St. Rep. 169, 69 Pac. 98]; *Island Rec. Dist.* v. *Floribel A. Syn.,* 167 Cal. 467, [140 Pac. 4]; *De Baker* v. *Southern California Ry. Co.,* 106 Cal. 258, [47 Am. St. Rep. 237, 39 Pac. 610]; *Horton* v. *Goodenough,* 184 Cal. 451, [194 Pac. 34].)

Commenting on the rule established by the decisions just cited, the principle is thus tersely stated in *Jones* v. *California Development Co.,* 173 Cal. 565, 574, [L. R. A. 1917C, 1021, 160 Pac. 823, 827]:

[3] "The underlying principle governing the decision of all these cases which deal with extraordinary water conditions, whether created by the ocean or by unexpected and unprecedented floods, is that in such stress the land owner may use every reasonable precaution to avert injury from his land, and whether or not his conduct be reasonable will be determined by existing conditions and not by after consequences; so that if the acts of the land owner be, in the light of the existing circumstances, not unreasonable, he will not be held liable for consequent damage which by these reasonable acts may be inflicted upon another land owner."

We recognize the limitation in all of these cases that such right of self-protection does not permit of any obstruction of or interference with the natural channel of the stream or diversion of the flow of the water in such channel.

[4] The distinction, too, is recognized in this state between the flood waters of a natural watercourse, and the surface drainage arising from rain or melting snow, or springs and swamps before they have found their way to and become a part of a stream or river.

As to such drainage our courts have adopted the rule of the civil law which places upon the proprietor of land the burden of permitting the passage over his land of the surface drainage in such a way as not to retard its flow from the lands above him, nor to concentrate and increase this flow upon the lands below. (*Ogburn* v. *Connor,* 46 Cal. 346, [13 Am. Rep. 213]; *Gray* v. *McWilliams, supra; Los Angeles etc. Assn.* v. *Los Angeles,* 103 Cal. 461, [37 Pac. 375]; *Cushing* v. *Pires,* 124 Cal. 663, [57 Pac. 572]; *Sanguinetti* v. *Pock, supra.*) In *Gray* v. *McWilliams, supra,* and *Sanguinetti* v. *Pock, supra,* the distinction between the rule applying to flood waters and that applying to surface waters is clearly pointed out.

[5] That the overflow waters of the Los Angeles River, spreading from the channels of the stream over the adjacent country and accompanying the channel waters in a parallel course to the sea, are flood waters and are subject to the

doctrine of flood and not surface waters will not be questioned.

[6] It follows from the authorities cited that the construction of dikes along and parallel with the river banks and the mere deepening of the river channel along its natural course, either by the Dominguez Company, or the Bixbys, for the protection of their respective lands on one or the other banks of the river, or by their joint action through dikes on both sides of the river, were not wrongful so long as they did not obstruct the natural flow of the stream or divert its course. If damage to lower proprietors had followed from such defensive construction, under the authorities cited, it would be *damnum absque injuria*. Even though the effect upon the channel of the stream below, by reason of increased flow and current between the embankments, was to silt and obstruct the lower channel, it would afford no ground of action. If the defendants merely fend the intruding waters from their own premises in a reasonable and prudent manner, they cannot be held responsible for the action of the stream in depositing more silt and debris either in the channel or on adjacent lands below than would have been done had it been permitted to spread over defendants' lands.

In the recent case of *San Gabriel Valley Country Club* v. *Los Angeles County*, 182 Cal. 392, [9 A. L. R. 1200, 188 Pac. 554], which involved liability of the county of Los Angeles resulting from the construction of a cement ditch or conduit in place of the natural channel of a watercourse, the effect of the change was to materially increase the flow and current of the water in the stream, thereby causing erosion of plaintiff's lands below. In the opinion it is said by Mr. Justice Olney: "Summing up the discussion, our conclusion, as we have stated, is that an improvement for the purposes of the drainage and protection of lands above does not give a lower riparian owner on the stream a cause of action merely because such improvement increases the volume of water in the stream as it comes to his land, even though the burden he is necessarily under of protecting his land against the stream is thereby increased and his land is injured because of his failure to meet such increased burden; and, further, that the rule is not subject to the limi-

tation that the increased volume must not be such as to make the stream exceed the capacity of its channel.''

This rule which permits the owners of lands subject to overflow from adjacent rivers to erect barriers to such overflow upon their own borders may, and often does, result in serious damage to adjoining or lower properties, but it is the only rule consistent with the development and improvement of vast bodies of potentially rich and valuable lands along low-lying river-bottoms. It is true that if the whole territory is permitted to lie in its native state, these periodical floods may repeatedly spread over the surface of the country in a gradual unobstructed flow and pass off with very little damage to the soil. But the moment improvements are made this condition begins to change. Every furrow that is plowed, every fence erected, every orchard planted, every irrigation ditch constructed, creates an obstruction or diversion which changes the course and volume of the current and starts new channels and cuts and erosions.

It becomes absolutely essential that those who build houses, plant crops and orchards, and make other valuable improvements must be permitted to shut out from their premises these vagrant floods though the result may overwhelm an adjoining or lower proprietor. In many of our California streams, particularly in the southern part of the state and near the sea, where the rainfall is periodical and the valleys low and level, the natural eroded bed of the stream is wholly inadequate to carry the flood waters in periods of heavy rainfall. In this case the channel of the Los Angeles River was but two or three feet lower than the surrounding surface of the valley, and one or two hundred feet in width. In seasons of flood the whole valley is needed as a watercourse. Under such circumstances, if the land owners on one · side of the stream build dikes and embankments it throws the whole volume of the flood on the opposite side. If both banks are protected the compressed and elevated volume of water is poured in a torrent upon any unprotected lands below. The only practical recourse is for every man to ''build over against his own house'' or for the community to join in a public system of flood protection for the entire exposed territory.

Returning to the consideration of the nature, effect, and responsibility for the acts here complained of, the undis-

puted evidence shows that almost immediately after the storm of January, 1914, which was the inception of the flood conditions that it is claimed in conjunction with the acts of defendants resulted in the damage suffered by plaintiff, the flood waters passing under the trestle and deflected by the bents of that structure toward the west washed out several hundred feet of the northerly end of the dike on the west bank and diverted a vast portion of the channel flow in that direction. This was never replaced. The attempt of the Dominguez Company to prevent further widening of the river channel after the first floods by putting a barrier of sand-bags across a wash in the river bank was trivial in its extent and not shown to have contributed in any way to plaintiff's damage.

It does appear in evidence that on subsequent occasions the city of Los Angeles erected barriers and dikes connecting with the Pacific Electric embankment at the northern end of the trestle and extending to a connection with the southerly remnants of the original westerly dike. It is clearly shown, however, that this was an entirely independent project carried on by the city of Los Angeles to protect the harbor of Los Angeles from becoming obstructed by silt from the floods; that it was not pleaded in the complaint, and that at least the defendants Bixby were not even remotely connected with it. The Pacific Electric Company gave its permission to a connection with its railroad embankment, and the Dominguez Company consented to its construction on their lands.

This obstruction by the city, if wrongful and injurious and attributable in any way to either of the defendants here, was an entirely new and independent cause of action, and if relied upon should have been separately pleaded.

It must be borne in mind that these embankments of the city of Los Angeles present a very different condition from the first construction work. They joined with the railroad embankment and extended at a sharp angle in the direction of the river, and were perhaps calculated to shift the course of the flood across the channel to the lands on the east. The dikes constructed by appellants ran approximately parallel with and close to the river channel, and left an open space under the trestle four hundred feet in width between the westerly dike and the northwesterly end of the trestle, where

it abutted on the railroad embankment, through which space a large part of the flood passing under the trestle could and did flow, and, in fact, was diverted from the easterly side of the valley by appellants' dike.

Our conclusion is that plaintiff's cause of action is reduced under the law and the undisputed facts in this case to a question of the responsibility for and the effect of cutting through the easterly dike, and the resultant divergence in that direction of the normal flow of the river and of a large portion of the flood waters during the overflow.

Directing our attention to this phase of the case the evidence shows without substantial dispute that for a period of forty or fifty years there had existed at this point where the cut in the embankment was made a natural channel opening out of the river-bed, within a foot or two of the bottom of the river, through which in time of high water a portion of the channel flow was diverted toward the east, and for some distance at least ran between defined banks. Farther down this flow spread out over the surface of the ground and the banks disappeared but there was a swale in that direction along the border of the mesa, and, at a road-crossing a quarter of a mile or so below, a bridge was maintained a good part of the time. Just what became of this water eventually does not very clearly appear, but the contour of the land shows that it would flow near the easterly mesa to the sea. It is also undisputed that the flow of water through this natural opening was so frequent and so threatening that it was customary in conditions of high water, after the general overflow had subsided within the banks of the river, to dam this side channel to prevent the passage of water to the lands on the east. On one occasion at least the plaintiff's predecessor in title bore part of the expense of making such a dam for the protection of the very lands in question here. It also is shown that these dams were invariably washed out upon the recurrence of a freshet.

If this was a natural channel of the river it was a wrongful act of the defendants to construct a dike over it, and the removal of such dike at that point would have been a duty.

But conceding that it was a mere inlet or by-pass, as plaintiff contends, such as was held properly subject to obstruction in an effort to protect adjacent lands from flood

waters in *Lamb* v. *Reclamation District, supra,* did any duty rest upon defendants to maintain their dike across it? We think clearly not if the result of the cut or opening was to restore the conditions at that point to their former and natural state. [7] The fact that a land owner avails himself of the right to repel vagrant waters of a river by embankments does not, in the absence of some further circumstances or set of circumstances, impose upon him any obligation to maintain such obstruction, or to refrain from restoring natural conditions. There is nothing .in the doctrine of self-protection against flood waters to prevent a land owner from applying it to a single acre of his lands or the conservation of a single annual crop by temporary structures.

[8] The doubtful question in this case is whether the opening of the dike at this point restored the side channel to its original condition. The evidence shows that the cut was made at the exact place of the old outlet, and it was made no wider and no deeper below the adjoining natural surface. It was, however, left with an artificial embankment extending up and down the river on each side of the opening. This cut was reopened at a time when the natural channel below had been more or less obstructed by an accumulation of silt apparently caused in part at least by the diking and dredging above. It is claimed that the result of reopening this side channel was to divert more water through it than would naturally have gone in that direction had the channel below been unobstructed. While the defendants had been within their rights in creating the conditions which filled up the lower channel, they would have no right to relieve themselves and others from the results of such damming of the natural channel by reopening this outlet to the east in a manner calculated to divert the natural flow. It is doubtless true that they were not legally liable in damages for any results directly attributable to the creation of or existence of this silt fill, conceding it to have been caused by the construction of their dikes. The silting was not, in the first place, a result contemplated by the defendants or perhaps reasonably to have been anticipated. They expected by the building of the dikes along the banks of the river and dredging the eroded channels to so increase the volume and flow of the channel as to keep it clear from silting and to even increase its capacity. That would ordinarily be the

natural result. The evidence shows, however, that after
this protection work was completed in 1913, the first rainy
season did not cause extremely high water in the stream,
and the effect of the moderate flood that did come was not
only to fill up the section they had dredged, but to pile silt
and sand along the bed of the river within their dikes a con-
siderable distance to the south, and even to raise the old
channel above the former level at a point just below where
the cut was afterward made. [9] It may further be said
that no liability could result to defendants from the silting
of the river-bed below for the reason that in diking and
dredging the channel merely for the purpose of enlarging
and directing its current in its normal course to prevent
the overflow of their adjacent lands, they were not account-
able for the disposition of the water or the silt and debris
it carried at points below. As in the case of *San Gabriel
Valley Country Club* v. *Los Angeles County, supra,* the in-
evitable consequence of straightening or deepening a channel
at a given point and increasing the flow and current of the
stream therein is to cause the extra flow of water to spread
out where the current ceases and to deposit at some point
below whatever debris it carries. In the natural course of
events, if the river embankments had remained intact the
excessive flood waters which followed in the spring of 1914
would have scoured out these beds of silt along this dredged
channel, but the inevitable result would have been to deposit
the silt further down wherever the waters were permitted
to spread out and the current was abated.

In other words, the operation of the river within such
protection works as riparian owners may lawfully make to
protect themselves from injury is attributable to the natural
flow of the stream.

Even so, the condition in which the river-bed was left at
the subsidence of the high waters of 1913 became its natural
condition. If the Bixbys found it with a sand-bank, below
the point where they made the cut, which was calculated
to divert the water from the natural channel, they would
have had a right to remove this obstruction as well as the
embankment and restore the natural flow of the river through
both channels; but they may not remove a portion of this
dike and reopen the old waterway to the southeast under cir-

cumstances which obviously would result in turning the main stream from the old natural bed into this side cut.

It is claimed that this was what happened and that thereafter, by reason of these conditions when the recurring high waters of 1914–16 came, the eastern opening was widened and deepened to an extent that would not have happened if the natural conditions had not been interfered with, and thereby a large volume of the flood waters caused to flow in that direction and overflowed and eroded a wide channel through plaintiff's lands below.

We are of the opinion that to whatever extent the evidence may show these conditions to have existed, and that the effect of making such change in the embankment and resultant damage, if any, were such as were reasonably to have been anticipated, the appellants responsible for such change in the channel would be liable.

As stated in *Jones* v. *California Development Co., supra,* however, the reasonableness and prudence of the act is to be determined by the conditions as they existed at the time, and not in the light of after consequences.

[10] Conceding, however, that an actionable wrong was committed, who was responsible for it? At the time the cut was made the defendant Amelia M. Bixby was the owner of the premises along the east side of the river, her husband having conveyed them to her after the dikes were constructed. Her husband, the defendant George H. Bixby, was the active agent in procuring the reopening of this outlet. His wife knew of it and consented to it and paid for the work, and in legal effect made her husband her agent for this purpose. It does not appear that she had any actual knowledge of the physical conditions or probable consequences of making this opening, but the law imposes upon her responsibility for the natural consequences of her act. The husband, although he had parted with title to this immediate property, was still owner of adjacent lands affected by the flood waters, and was originally responsible for the closing of this side channel. He had an independent and personal interest in reopening it. Though neither of them were actuated by any purpose or thought of wrongdoing, we think they were jointly responsible for any damage which resulted and which was reasonably to have been anticipated from an unnatural increase of flood waters through this opening.

We fail to see how the defendant Dominguez Estate Company was a party to the reopening of this side channel. As already pointed out, the original dike and dredging for which it was responsible was not wrongful. The dike on the east side of the river, though built by the Dominguez Company, was constructed for and became the property of George H. Bixby and was for his benefit. The Dominguez Company had no further interest in or control over it. It was of no benefit or concern to their property. They had no part in advising or making this cut. It is true the president of the Dominguez Company knew of Mr. Bixby's purpose, and expressed the opinion that he had a right to either maintain or remove the obstruction as he saw fit, but such expression would not make him personally liable for consequences of the act, much less bind the corporation to such liability.

It follows from this reasoning that the evidence does not support a verdict against the Dominguez Company.

We doubt greatly whether the evidence justifies the conclusion that the opening of the cut in this eastern embankment by the defendants Bixby was the efficient and proximate cause of the erosion and silting of plaintiff's land, or that such damage would not have resulted if such cut had not been made. It can hardly be questioned under the facts in this case that the floods of January and February, 1914, were unusual and excessive. Not only was the natural flood drainage of the Los Angeles River of this excessive nature, but the evidence shows that the main channel of the San Gabriel River had cut through the intervening plain between the natural course of the two streams and was adding its waters to the floods of the watershed of the Los Angeles River. The whole country above and below the Pacific Electric embankments was a great lake. All the trestles of the railroad embankment across the Narrows were running to their full capacity, to the northwest of this trestle at the main channel of the river, and at this point through the one thousand feet of this opening a flood was pouring for the entire width and to within two or three feet of the top of the timbers. The dikes along the river were flooded and in places out of sight. Several hundred feet on the westerly side were washed out. Some time during the overflow a wide strip of the easterly embankment below the

Bixby cut was washed away by the current. The greater part of this deluge of water was pouring under this long trestle, and being more confined at this place was, of course, moving with a more rapid current and carried silt and debris which, when the waters spread out below and as the current slackened, was deposited in the lower channels and on the overflowed lands. One of the natural channels of the river crossed plaintiff's property and, turning to the east, skirted along its southerly border. In previous overflows this land had been silted and more or less eroded. It would inevitably have been overflowed during the high waters of these floods of 1914–16, irrespective of the making of the Bixby cut; and the natural channel at the Bixby cut without any artificial embankments would have had to carry to its full capacity during these periods of high water. It is admitted by the testimony of plaintiffs that these lands suffered no material injury during the moderate freshets of 1913 after the cut had been made, or until the extremely high waters of 1914.

There is no serious conflict in the evidence as to the physical conditions surrounding these successive floods. The case resolves itself merely into inferences to be drawn as to the result of these various conditions. We recognize the province of the jury to determine these inferences in all instances where reasonable minds might reach different conclusions. Yet when we take into account the immensity of this flood, the eddies and currents and backwaters and shifting channels of this cataclysm of nature, and in face of the fact that all along the course of this river other lands were eroded, new channels created, and great areas of silt and debris deposited, entirely independent of the acts of these defendants, the question remains whether any conclusion that the actions of appellants were the proximate cause of damage to plaintiff's land can be more than a surmise or conjecture.

Conceding, however, that there was sufficient evidence to make the nature and effect of the reopening of this side channel a question for the jury, there were errors of law occurring at the trial which, in our judgment, call for a reversal.

[11] We are satisfied that there appears on the face of the complaint a misjoinder of parties defendant and of independent and unrelated causes of action. A cause of

action is stated against the Pacific Electric Company for damages resulting from the construction and maintenance of its railroad embankments and trestles across the channel of the Los Angeles River during the year 1901 in such a way as to interfere with and divert the natural flow of the river upon plaintiff's land to its damage. A cause of action is stated against the other defendants for constructing in 1913 embankments along the banks of the Los Angeles River and dredging and deepening the channel thereof, and in afterward cutting an opening in such embankments in such fashion as to wrongfully divert the waters of the river from their natural course on to plaintiff's land, thereby washing and eroding them. No causal relation is pleaded to connect these independent and widely separated acts into one cause of action, or to show a joint liability for the damages alleged. It does not appear that the defendants appealing here were in any way connected with or responsible for the construction or maintenance of the embankments or trestles of the Pacific Electric Company, or that they made use of them as a part of their system of flood protection. Neither does it appear that the Pacific Electric Company in any way aided, advised, or permitted the diking of the river banks, or dredging of the channel, or had any right to control or interfere with the appellants in that work, or that the acts of appellants in any way rendered the trestles and embankments of the railroad harmful in any greater or different way than if the work of appellants had not existed.

The only connection suggested is in an allegation that appellants constructed their flood barriers in the vicinity of the railroad embankments and trestle knowing of the existence of such structures and of their effect in increasing the flood volume of the river at this point. This may be admitted, and that one of the reasons for attempting to protect their lands at this point was the increased danger from the river by reason of the concentrated power of the floods under this trestle. Not being in any way responsible for this added peril, they had a right to fortify themselves against it.

[12] Respondent in its brief correctly states the condition of *joint tort-feasors:* (1) A concert of action; (2) A unity of purpose or design; (3) Two or more defendants

working separately but to a common purpose and each act-
ing with the knowledge and consent of the others.

We do not think that any of these relations are shown
here between the Pacific Electric Company and the other
defendants.

The objections by way of demurrer, answer, and motion
to this misjoinder were well taken.

There are numerous exceptions to rulings of the trial court
in admitting evidence prejudicial to appellants relating to
defendant thus improperly joined with appellants, and to
the work of flood obstruction and diversion by the city of
Los Angeles, not covered by the pleadings, and in no way
connected with the defendants Bixby. In some instances
the prejudicial effect of such evidence may have been avoided
by rulings of the court limiting its application to designated
defendants, or by instructions to the jury, but there was
a great deal of testimony directed to these unrelated trans-
actions and defendants which the jury was left at liberty
to apply to appellants and which was calculated to fix upon
them in the minds of the jurors liability for diversions of
the flood waters for which they were not responsible either
under the pleadings or the proof.

For instance, although the jury absolved the Pacific Elec-
tric Company from liability to the plaintiff for any of its
railroad construction, it was left free to hold the appellants
accountable for damage which might reasonably be attributed
to the embankment of the railroad across the valley at this
point in a southeasterly direction calculated to concentrate
the flood waters at the trestle over the main channel of the
river in the direction of plaintiff's lands. It can hardly
be doubted that the increased volume and current of the
river at this point and from this cause had much to do with
the amount of silt that was deposited in the river channel
and over the adjacent lands below, and in increasing the
flood of water through the plaintiff's lands. These results
would have been properly charged to appellants under the
theory of the complaint that all of the defendants named
were associated in a common purpose and working to a
common end, but were improperly in evidence under our
view of the relations of the parties.

Likewise, the testimony offered as to the embankments
attempted by the city of Los Angeles was not only inad-

missible as relating to an independent cause of action not pleaded, and with which at least the defendants Bixby were not connected, but was prejudicial, for the reason that it quite probably influenced the jurors to include in their verdict compensation for damages which they attributed to these embankments.

[13] We think, too, the trial court in its instructions to the jury failed to sufficiently discriminate between acts of the defendants which they might rightfully exercise in the construction of dikes and levees along the banks of the stream to protect their property from the invasion of flood waters, although the effect might be to increase the flow of the stream upon lower proprietors, and such acts as would amount to an interference with the natural current within the channel itself. As, for instance, the jury was instructed (instruction No. 10) that while there was no vested right in plaintiff to have the flood waters of the Los Angeles River overflow through the farming lands adjacent, "the absence of such right did not authorize any person or corporation to so divert or concentrate such flood water as to cause damage to the lands of plaintiff referred to in the complaint if you find that said flood water was so diverted or concentrated."

The jury was thus instructed that defendants were liable for any damage caused by an increased volume or flow of water upon their lands resulting from protective dikes along the river bank constructed by defendants. This is directly in conflict with the rule laid down in *San Gabriel Country Club* v. *Los Angeles County, supra,* and other cited cases.

[14] The jury was also erroneously instructed that it was the duty of the defendants, if they undertook to protect their property or any part of it from overflow, "to construct and complete said dikes and embankments from the point of beginning continuously to the downstream edge of their said property, so that the owner of land next below in the course of the stream and riparian thereto could in like manner protect his said land by similar construction joined to the said embankments."

As already pointed out, we find no authority to thus qualify the right of self-protection against the flood waters of a stream so as to require the diking of all or none of the defendants' riparian possessions; or to create a liability in dam-

ages for an increase by such means of flood waters upon lower proprietors.

As we understand the California decisions on this point, the right to repel flood waters is purely one of self-defense. The proprietor of land so threatened can ward off the danger by suitable obstruction to the invasion of his land at any point upon his own premises, and by any means that does not go beyond the limits of a defensive act, and become an aggressive diversion of the natural flow upon other propri. etors.

We are of the opinion that there was prejudicial error in refusing defendants' proposed instruction covered by exception No. 298, and also in the giving of the instruction as modified by the court.

The instruction as proposed properly presented to the jury defendants' theory that the damages complained of were caused by the excessive and unusual extent of the floods together with the conjunction of the waters of the San Gabriel River with those of the Los Angeles River, rather than as the result of any acts of the defendants, and declared the burden of proof was upon the plaintiffs to show that the injuries complained of were the result of the wrongful and negligent acts of the defendants, and that if they believed from the evidence that such damage was the natural and proximate result of the excessive flood waters, and that the same or substantially the same injuries would have occurred if the dikes of defendants and the subsequent cut in the east embankment had not been made, their verdict should be for defendants.

The instruction as modified embodied some of these limitations on defendants' liability, but coupled with the conditions for which defendants might be held responsible, the effects which might be attributed to the embankments and trestles of the Pacific Electric Railway Company, for which appellants were in no way liable.

There are nearly three thousand pages of the record on this appeal, and very many specifications of error are presented and elaborately argued. It is impracticable to consider in detail all the points discussed. We have pointed out errors which call for a reversal of the judgment. If a new trial is had the issues will be so narrowed under the views here expressed as to obviate a recurrence of many of

the remaining objections to the introduction of evidence and to instructions given or refused.

As has been said, many of these have been rendered harmless by the elimination of some of the parties under the verdict, and by the withdrawal of objectionable evidence from the jury, but we cannot doubt that in the matters herein discussed arising out of misjoinder of parties and causes of action, and admission of evidence on issues not covered by the pleadings, the defendants against whom the verdict of the jury was returned have been seriously prejudiced.

The judgment is reversed.

Wilbur, J., Angellotti, C. J., and Lennon, J., concurred.

OLNEY, J., Concurring.—I concur in the judgment of reversal and in the main opinion except in its discussion of the liability of the two Bixbys because of the cut which they caused to be made in the levee which had been previously constructed along the southeasterly bank of the river. The main opinion would seem to hold that it may be there was evidence sufficient to justify the verdict against the Bixbys because of their having made this cut. In my judgment this is not true; the evidence shows that the cut was in nowise the cause of any injury done the plaintiff's land.

As I understand the main opinion, it applies to the present case the principles contained in the quotation which it makes from *Jones* v. *California Development Co.,* 173 Cal. 565, [L. R. A. 1917C, 1021, 160 Pac. 823], and holds that while the defendants were under no obligation to maintain the embankments they had constructed, that is, either to prevent breaks therein caused by natural forces or to repair such breaks, yet they had no right to cut or remove those embankments, if they knew or should reasonably have known that the result of so doing would be to change the channel of the stream, and that because the evidence was sufficient to justify the possible conclusion that when the Bixbys cut the southeasterly levee they should have known that it would not improbably change the channel of the stream, it was sufficient to justify the verdict. With the proposition that the principles announced in *Jones* v. *California Development Co.* apply, I agree. I am not so certain that the evidence justifies any conclusion that the Bixbys should have known

that the making of the cut would not improbably change the channel. Nor am I certain that the channel actually did change. There had been a flood water channel there before, and I am not certain that anything more appears than that the channel continued as a flood-water channel merely. But passing these doubts and assuming both that the channel was changed and that the Bixbys should have known that the cut in the embankment would not improbably cause it to change, the evidence, to my mind, shows conclusively that it was not in fact the cut that did cause it to change.

The cut in question was a small one—six feet across on the bottom. When the first flood came after its being made, the flood of January, 1914, the embankments on both sides were intact except for the cut. The flood was one of the highest known. It spread over the plain below the railroad trestle where the plaintiff's lands lie, practically from mesa to mesa, and flowed across this plain to the ocean. It would have done this if the embankments had been intact and had remained so. The embankments extended only a comparatively short distance into the plain, and the high waters of the river on reaching the ends of the embankments and being released from their restraint would have flowed around the ends and covered the entire plain, as they did. In fact, one of the witnesses for the plaintiff testifies that in the minor floods of 1912–13 the water ''backwatered'' around the ends of the embankments in just this fashion. The plaintiff's lands were a mile or more below the lower ends of the embankment, and directly in the course of flood waters passing them. More than this, the channel of the river divided immediately below the embankments and one branch ran to and across the plaintiff's lands. I do not understand that it is contended that the plaintiff's lands would not have been flooded if it had not been for the cut. What is contended is that by the cut, the channel was changed so that the flood came with greater force and carrying more silt and sand with consequent erosion of the plaintiff's land and a deeper deposit upon it.

Now, it is evident that the cut operated in the first instance only to permit the water to pass through the embankment. It is likewise evident that if the water would have broken the embankment, if the cut had not been there, and would have broken it at or about the same place, the

final result would have been the same and the cut was not a factor in causing that result. It was due to the flooding river alone. But the fact that the water would have broken the embankment if the cut had not been there is demonstrated by the fact that it did break through even with the cut there. The situation when the flood of January, 1914, came was, as I have said, that the levees on both sides of the river were intact except for the cut. The amount of water coming down was enormously greater than could be carried in the space between the two embankments. The result was that both gave way. That on the northwesterly side went out for a single stretch of some six hundred feet or more. That on the southeasterly side broke just a few yards below the cut. It cannot be questioned that this break would have taken place if the cut had not been there for the effect of the cut was to relieve, not to increase, the pressure upon the levee below it. Furthermore, the width of the break was greater than that of the cut even after the latter had been enlarged by the passage of the two floods of January and February, 1914. The plaintiff's own maps and the testimony of its witnesses show that after these floods the cut had been enlarged to a width of fifty or sixty feet only, while the break had a width of over one hundred feet. The levees were of light soil, easily eroded, and there would seem to be no escape from the conclusion, not only that the levee would have been broken if the cut had not been there, but that if it had not been there and the levee had held at that point, the break below would have been correspondingly enlarged because of the increase of pressure, so that the amount of water that passed through the levee would have been substantially the same. In addition to these circumstances, there is the further fact that the contour of the land on the inner side of the break is such that water passing through the break would follow the same course across the Bixby land to that of the plaintiff as water passing through the cut. We have, then, these three conclusions, from none of which, in my judgment, is there escape: First, that the levee would have broken, as it actually did, even if the cut had not been there; second, that substantially the same amount of water would have passed through this break; and, third, that the water so passing through would follow the same course as water passing

through the cut. If these things be true, it means that the cut was not a factor in the final result.

So far, I have been discussing the case with reference to the flood of January, 1914, the flood which came when the levees were intact except for the cut. But if the defendants are not responsible for injury done by this flood, they are certainly not responsible for any done by subsequent floods. They were under no obligation to repair the levee, and when those floods came, the levee was already broken. The conditions which those floods met were conditions caused by the previous flood and for which the defendants were not responsible. Not being responsible for those conditions, nor under obligation to remedy them, they were not responsible for injury which the subsequent floods may have worked because of them.

Shaw, J., and Lawlor, J., concurred.

Rehearing denied.

All the Justices concurred.