[Civ. No. 14245. Second Dist., Div. Three. Oct. 31, 1944.]

DAPHNE B. SMITH et al., Appellants, v. CITY OF LOS ANGELES et al., Respondents.

[Civ. No. 14244. Second Dist., Div. Three. Oct. 31, 1944.]

ARTHUR REALTY CORPORATION (a Corporation), Appellant, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Respondents.

[Civ. No. 14254. Second Dist., Div. Three. Oct. 31, 1944.]

LUTHER B. STAHL et al., Appellants, v. CITY OF LOS ANGELES et al., Respondents.

564

Earle M. Daniels, Julius V. Patrosso, Sherman Grancell and Kenneth W. Kearney for Appellants.

J. H. O'Connor, County Counsel, S. V. O. Prichard, Assistant County Counsel, Ray L. Chesebro, City Attorney, S. B. Robinson, Chief Assistant City Attorney, Mark A. Hall, Assistant City Attorney, Wendell Mackay, C. T. Waldo and Louis A. Babior, Deputies City Attorney, and Bauder, Veatch, W. I. Gilbert and Jean Wunderlich for Respondents.

FOX, J. pro tem.—This is an appeal by the plaintiffs from a judgment in favor of the defendants following an order sustaining, without leave to amend, demurrers to the first amended complaint. The demurrers were sustained not only upon general grounds but also upon the further grounds that any cause of action stated in the amended complaint was barred by the statute of limitations and by laches. (Other grounds of demurrer were marked off calendar.)

This action was instituted by some 176 different plaintiffs, or groups of plaintiffs, seeking to recover damages for injuries sustained by each as a result of the flooding of their respective properties during the early part of March, 1938, by the overflowing of the Tujunga River, alleged to have been caused by the construction therein by the defendants, the county of Los Angeles, Los Angeles County Flood Control District, Southern Pacific Company and Southern Pacific Railroad Company, of certain dikes, which had the effect of diverting all of the waters normally flowing in its easterly channel into the westerly and middle channels thereof, and which latter channels were inadequate to accommodate the increased flow, due in part to the construction of certain other dikes in the westerly channel by the defendants, the city of Los Angeles, its department of water and power and said flood control district. The causes of action of all plaintiffs are substantially similar.

It should be noted that there are two companion cases, in which it has been stipulated that the briefs herein shall serve

as the briefs in those cases because of the identity of the pleadings. Those cases are: *Arthur Realty Corporation* v. *Los Angeles County Flood Control District et al.*, 2nd Civil No. 14244, and *Luther B. Stahl, et al.*, v. *City of Los Angeles, et al.*, 2nd Civil No. 14254. There are fifty plaintiffs, or groups of plaintiffs, in the latter case. The aggregate amount of damages claimed by the plaintiffs in the three cases is approximately $1,715,000.

In the interest of brevity the city of Los Angeles will be referred to as the "city"; Department of Water & Power as the "department"; county of Los Angeles as the "county"; Los Angeles County Flood Control District as the "district"; and Southern Pacific Company and Southern Pacific Railroad Company as the "railroad companies."

For the purpose of summarizing the allegations upon which the plaintiffs base their right to recover, we have selected the amended complaint of Daphne B. Smith. It contains four separate causes of action. The first is directed against the district, the railroad companies and the county. After stating the corporate or political status of the various defendants, it alleges the following as facts:

From time immemorial there existed and now exist, in the county of Los Angeles, two natural watercourses, each with well defined banks and beds, commonly known as the Big Tujunga River and the Little Tujunga River. Each of said rivers has its source in the westerly slope of the San Gabriel Mountains in said county. The Little Tujunga as it leaves its mountain canyon and ravine flows in a general southerly direction, while the Big Tujunga as it leaves its mountain canyon and ravine flows in a general westerly direction, after which the two streams come together and form a confluence, from which point the stream is known as the Tujunga River. Below such confluence the Tujunga River divides into two natural channels, which are designated as the easterly channel and the westerly channel respectively. The westerly channel in turn divides into two natural channels which are designated as the westerly channel and the middle channel, respectively. The easterly channel runs in a southerly direction, while the westerly channel runs in a southwesterly and southerly direction, and the middle channel runs in a southerly direction from the point where it debouches from the westerly channel.

During the year 1877 there was constructed, by persons to the plaintiff unknown, an embankment or dike in the vicinity

of the confluence of these rivers, which began at the base of the Verdugo Hills (forming a part of the southerly bank of the Big Tujunga River) and which ran westerly and southwesterly therefrom for a distance of approximately 1,300 feet. This dike is referred to as the "1877 Dike." It has remained in existence at all times but has been reinforced and strengthened by certain of the defendants. Said dike did not at any time obstruct the waters of the Tujunga River which naturally flowed in the easterly channel thereof from flowing therein, and all of the waters of the Tujunga River which naturally flowed in the easterly channel continued to flow therein after the construction of the said 1877 dike until the easterly channel was obstructed and closed by the dikes and embankments constructed by certain of the defendants as hereinafter set forth.

During the years 1911 and 1912, the railroad companies constructed a dike or embankment across the entrance of the easterly channel, which extended in a southwesterly direction from the 1877 dike for a distance of approximately 2,300 feet and into the point of land dividing the easterly and westerly channels of said river. This dike is hereafter referred to as "Southern Pacific Dike No. 1." During the year 1914 a portion of this dike (approximately the northeasterly 1,050 feet thereof), was washed away, and thereafter, during the years 1914 and 1915, the county, with the consent and approval of the railroad companies, reconstructed and restored a portion thereof by the construction of a dike or embankment which extended approximately 850 feet from the southwesterly end of the 1877 dike and along and upon the same location formerly occupied by the portion of said Southern Pacific Dike No. 1 which was so washed away. Following the reconstruction and restoration of such portion of Southern Pacific Dike No. 1 by the county there remained a gap or opening of approximately 200 feet between the southwesterly end of the reconstructed portion thereof and the part of said Southern Pacific Dike No. 1 which had been left standing. This gap was, during the year 1917, closed by the county by the construction, with the consent and approval of the railroad companies, of a dike across the same. At the same time, the county strengthened and reinforced the portion of the dike previously restored and reconstructed by it in 1914 and 1915, as well as

the 1877 dike. The dikes so constructed by the county are referred to as "County Dikes."

During the years 1914 to 1917 the railroad companies constructed along the southerly and easterly bank of the westerly channel a dike extending in a southwesterly direction from the southwesterly end of Southern Pacific Dike No. 1 to San Fernando Road. This dike is referred to as "Southern Pacific Dike No. 2." Following the completion of this last named dike and at all times thereafter there existed a continuous dike or embankment, faced over its entire distance upon its streamward side with riprap, extending from San Fernando Road northeasterly to the foot of the Verdugo Hills, which dike at all times subsequent to 1914 was maintained in part by the county and in part by the railroad companies.

During the years 1931 and 1932 the district, with the consent and approval of the railroad companies and the county, constructed a dike "immediately contiguous to and on the streamward side of and tied in with Southern Pacific Dike No. 1, Southern Pacific Dike No. 2, and the County Dike." Said dike extended northeasterly from San Fernando Road to approximately the southwesterly end of the 1877 dike "into which it was tied." This dike is referred to as the "Flood Control Dike." The said flood control dike was constructed "for the purpose of strengthening and reinforcing" all the previously constructed dikes, namely, Southern Pacific Dike No. 1, Southern Pacific Dike No. 2, the county dikes and the 1877 dike, and "in order to more effectively and permanently obstruct the entrance of the easterly channel of the Tujunga River," and thus prevent the waters naturally flowing to and in the easterly channel from flowing therein, and to divert the same from the said easterly channel to the westerly channel thereof; that all said dikes "constituted a single structure, each unit of which was designed to and did contribute to strengthen, sustain and support the whole structure," and was "designed for the sole purpose of permanently closing the entrance of the easterly channel of the Tujunga River and diverting all of the waters naturally flowing in said easterly channel to the westerly channel thereof." All the dikes hereinbefore mentioned except the 1877 dike were erected upon land belonging to the Los Angeles Land & Water Company pursuant to licenses or permits granted by it to the various defendants.

The easterly channel of the Tujunga River in its natural

state from time immemorial had carried, and but for the erection and maintenance of said dikes would have continued to carry substantially all or the greater portion of the waters of said Tujunga River, but the dikes constructed by the defendants collectively operated to and did completely obstruct the entrance of the easterly channel and effectively prevented any of the waters which would naturally flow to and into said easterly channel from flowing therein and diverted all of said waters to the westerly channel of said river. The westerly channel and middle channel in their natural state, and prior to the erection of said dikes across the easterly channel, carried, and but for the erection and maintenance of said dikes would have carried, only a small portion of the waters of said river, and while each in its natural state was entirely adequate and of sufficient capacity to hold and carry and would have held and carried such of the waters of said Tujunga River as naturally flowed therein without overflowing its banks, each was wholly inadequate and of insufficient capacity to carry all of the waters of said river or the greatly increased flow which was diverted therein and thereto from the easterly channel by the construction and maintenance of the dikes across the easterly channel of said river.

Between the 1st and 5th days of March, 1938, a heavy rainstorm occurred, as a result of which a large body of storm waters collected and flowed into the Big Tujunga and Little Tujunga Rivers, and by reason of the erection and maintenance of the dikes across the easterly channel of the Tujunga River all of the waters of said stream or the greater portion thereof which normally would have flowed in and down the easterly channel away from the lands and premises of the plaintiff were diverted from and kept out of said easterly channel and were forced to, in and down the westerly channel and middle channel of said river, as a result of which each of the said last named channels was overtaxed and overflowed its banks, and the waters thereof were caused to flow over, upon and across the lands and premises of the plaintiff, to her damage in the sum of $9,000. The first cause of action concludes with an allegation as to the timely presentation of claims for damages to the county and to the district, and the rejection thereof by each of said defendants.

The second cause of action is directed against the railroad companies and the county. It repeats substantially all of the

facts alleged in the first cause of action, and further alleges that the dikes constructed and maintained by the railroad companies and the county were constructed and maintained in a negligent manner, in that the defendants knew or should have known that the westerly and middle channels were inadequate and of insufficient capacity to hold and carry the waters of the Tujunga River, particularly during periods of heavy rainfall, and that the diversion thereto of the waters naturally flowing in the easterly channel would cause the waters of said river to overflow the said westerly and middle channels and flood the properties of the plaintiff and others similarly situated, but that the defendants negligently failed to deepen or improve the westerly channel or middle channel so that the same would hold and carry the waters which were diverted into each of them from the easterly channel or to provide reasonable or any means whereby the said waters so diverted from the easterly channel might be conveyed into and by the westerly and middle channels without damage to the surrounding territory lying southerly and westerly from the point of diversion. It is further alleged that the supervisors of the county had knowledge and notice of the dangerous condition created by the erection and maintenance of said dikes, but took no action looking toward correcting this dangerous condition.

The third cause of action is directed against the district, alone. It is substantially similar to the first cause of action, and alleges that the damages occasioned to the plaintiff resulted from the construction and maintenance by the district of the dike which it constructed across the easterly channel of the Tujunga River.

The fourth cause of action is directed against the district, the city, and the department. It alleges all the facts set forth in the first cause of action and in addition thereto the following: during the years 1926 and 1927 the district constructed a dike "in and across substantially the whole" of the westerly channel of the Tujunga River where the middle channel debouches from said westerly channel, which dike was approximately 4,341 feet in length and consisted of a double pipe and wire fence approximately six feet high. This dike is referred to as the "Westerly Dike," and was constructed by the district for the purpose of diverting and it did divert substantially all of the waters then flowing into the westerly channel

of said river into the middle channel thereof. Following the construction of the westerly dike and during the year 1932 the city and the department, with the consent and approval of the district, constructed a dike at a point beginning near the northerly terminus of the said westerly dike and extending in a southerly direction for approximately 3,200 feet. This dike is referred to as "City Dike." It consisted of a single row of 2-inch pipe extending for a distance of approximately 800 feet from the northerly end of the westerly dike and a double row of 6-inch pipe for a distance of approximately 2,400 feet; said pipes were driven in front of and on the streamward side of and immediately contiguous to the westerly dike; wire netting was attached to said pipes and behind the said pipes and wire there were deposited and placed earth, rocks and boulders; said city dike was constructed for the purpose of strengthening and reinforcing the westerly dike, and in order to more effectively divert the greater portion of the waters flowing in the westerly channel of the Tujunga River to and into the middle channel of said river. Both the city dike and westerly dike were constructed upon land belonging to the city and the department, the latter dike having been constructed by the district pursuant to a permit or license granted to it by said city and department.

Immediately prior to the construction of the said westerly dike and said city dike the westerly channel of the Tujunga River had carried, and but for the erection of said dikes would have continued to carry substantially all the waters then flowing in the westerly channel, but the erection and maintenance of said last mentioned dikes operated to and did obstruct the westerly channel and prevented the greater portion of the waters which would otherwise flow in said westerly channel from flowing therein. The middle channel in its natural state was adequate and of sufficient capacity to hold and carry and would have held and carried such of the waters of the Tujunga River as naturally flowed therein without overflowing its banks, but was wholly inadequate and of insufficient capacity to carry all of the waters of said river or to carry the greatly increased flow diverted therein and thereto from the westerly channel by reason of the construction and maintenance of the said dikes therein, and but for the erection and maintenance of said dikes all of the waters naturally flowing in the westerly channel or the greater portion thereof would

have flowed in and down the westerly channel and away from the lands and premises of the plaintiff. Following the heavy rainstorm which occurred between the first and fifth days of March, 1938, as a result of which large volumes of water collected in the Tujunga River, the waters thereof were, by the said dikes so constructed in the westerly channel, diverted into the middle channel, as a result of which the said middle channel overflowed its banks and said storm waters were caused to flow over, across and upon the lands and premises of the plaintiff, to her damage. This cause of action concludes with an allegation with reference to the timely presentation of claims for damages to the district, the city and the department, and their rejection.

In our opinion the amended complaint states a cause of action in each count against the defendant or defendants therein named and the right of the plaintiffs to recover thereon is not barred by the statute of limitations or by laches.

The gravamen of the first three causes of action in plaintiffs' amended complaint is that the county, the district and the railroad companies, by the erection of dikes in and across the easterly channel of the Tujunga River, diverted therefrom the waters naturally flowing therein to the other channels from which said waters escaped by reason of their inadequacy to hold and carry the increased flow, with resultant damage to the plaintiffs. The foundation for the fourth cause of action is that the district, city and department, by the erection of the dikes ''in and across substantially the whole of the westerly channel'' where the middle channel debouches from it, diverted ''substantially all of the waters'' into the middle channel which was of insufficient capacity to carry the greatly increased flow, resulting in damage to plaintiffs' property.

 It is clear that neither a natural person nor a private corporation may, with impunity, obstruct or divert the flow of a natural watercourse to the damage of another's property. This is the holding in *Hellman etc. Bk.* v. *Southern Pac. Co.* (1923), 190 Cal. 626 [214 P. 46], wherein the two railroad companies which are defendants in these actions were held liable for damages resulting from the diversion of the waters of this same easterly channel of the Tujunga River by the dike built across said channel in 1912 by the railroad companies and referred to herein as Southern Pacific Dike No. 1. (See, also, *Horton* v. *Goodenough* (1920), 184 Cal. 451, 453 [194 P.

34], and *Mogle* v. *Moore* (1940), 16 Cal.2d 1, 10 [104 P.2d 785].)

The same rule likewise applies where the diverter is a municipal corporation or political subdivision of the state. (*Conniff* v. *San Francisco* (1885), 67 Cal. 45, 48 [7 P. 41]; *Richardson* v. *City of Eureka* (1892), 96 Cal. 443, 447 [31 P. 458]; *Los Angeles Cemetery Assn.* v. *Los Angeles* (1894), 103 Cal. 461, 467 [37 P. 375]; *Tyler* v. *Tehama County* (1895), 109 Cal. 618, 621 [42 P. 240]; *Geurkink* v. *City of Petaluma* (1896), 112 Cal. 306, 308 [44 P. 570]; *Rudel* v. *Los Angeles County* (1897), 118 Cal. 281, 288 [50 P. 400]; *Larrabee* v. *Cloverdale* (1900), 131 Cal. 96, 98 [63 P. 143]; *Elliott* v. *County of Los Angeles* (1920), 183 Cal. 472 [191 P. 899]; *Pacific Seaside Home* v. *Newbert Protection Dist.* (1923), 190 Cal. 544 [213 P. 967]; *White* v. *City of Santa Monica* (1931), 114 Cal.App. 330 [299 P. 819]; *Jefferis* v. *City of Monterey Park* (1936), 14 Cal.App.2d 113 [57 P.2d 1374]; *Archer* v. *City of Los Angeles* (1936), 15 Cal.App.2d 520 [59 P.2d 605]; *Archer* v. *City of Los Angeles* (1941), 19 Cal.2d 19, 26, 28 [119 P.2d 1]; *Mitchell* v. *City of Santa Barbara* (1941), 48 Cal.App.2d 568, 571 [120 P.2d 131].)

The foundation for this liability as against public bodies is section 14 of article I of the state Constitution which prohibits the taking or damaging of private property without compensation. The applicability of the principle is well illustrated by *Elliott* v. *County of Los Angeles, supra,* where the county had diverted storm waters from their natural course resulting in damage to the plaintiff. The court said (p. 475): " . . . The case, therefore, is one wherein property has been damaged by works constructed for public purposes, and no compensation has been provided or paid in advance as required by the Constitution. (Art. I, sec. 14.) In such cases the rule is well established that if the property is not condemned by legal proceedings and the damage paid in advance before the construction of the works, the county is liable for the damage resulting therefrom, and an action will lie against it for the recovery thereof." The first case cited in support of this statement is *Tyler* v. *Tehama County, supra,* which was an action for damages caused to plaintiff's property by the erection of a bridge over Elder Creek, the abutments of which operated to turn the current of the stream against the plain-

tiff's property, to his damage. The court there discussed at great length the damage provision of article I, section 14, of the Constitution, and held that plaintiff was entitled to recover the consequential damages he had suffered under the authority of that constitutional provision. The final word on the right to recover consequential damages under article I, section 14, of the Constitution, is *Rose* v. *State of California* (1942), 19 Cal.2d 713 [123 P.2d 505].

Under the principles set forth in these authorities the allegations of plaintiff's amended complaint state facts sufficient to constitute a cause of action against any of the defendants who participated in obstructing the aforesaid channels and thus diverted the waters onto her property unless the acts therein alleged are legally excused or recovery for their consequential damage is barred by lapse of time.

It is strenuously argued that two different groups of these dikes did not have any part in obstructing the easterly channel and diverting the water into the other channels and ultimately onto plaintiff's property. The first group of these dikes consists of the 1877 dike, Southern Pacific Dike No. 2 and so much of the flood control dike as lies immediately in front of and on the streamward side of Southern Pacific Dike No. 2. It is said that these dikes are innocent structures; that they did not in any way prevent the waters of the Tujunga River from flowing into the easterly channel. The second group of dikes consists of Southern Pacific Dike No. 1 and the county dikes. It is argued that since the flood control dike is larger, higher and stronger than the other two it must have operated by itself to obstruct the entrance to the easterly channel. Therefore, so the argument goes, neither Southern Pacific Dike No. 1 nor the county dikes had any part in diverting the water from the easterly channel and consequently neither could have been the proximate cause of any damage sustained by the plaintiffs. The answer to both these arguments is the same. It is to be found in the allegations contained in the first cause of action of the amended complaint. It is there alleged that the "Flood Control dike was constructed immediately contiguous to . . . and *was tied in with* Southern Pacific Dike No. 1, Southern Pacific Dike No. 2 and the County Dike" (italics added); also, that it *was tied into* the 1877 dike. It is further alleged that the "*Flood Control Dike was constructed . . . for the purpose of strengthening and reinforcing Southern Pacific Dike No. 1, Southern*

*Pacific Dike No. 2, the County Dikes,* and the 1877 Dike, and *in order to more effectively and permanently obstruct the entrance of the easterly channel* of the Tujunga River. . . . *That said Flood Control Dike and said Southern Pacific Dike No. 1, Southern Pacific Dike No. 2 and the County Dike constitute and at all times herein mentioned have constituted a single structure, each unit of which was designed to and did contribute to strengthen, sustain and support the whole structure* . . . ." (Italics added.) These allegations, like all other factual allegations of the amended complaint, must be accepted as true since the judgments appealed from followed sustaining of defendants' demurrers without leave to amend. Regardless then of how innocent some of these dikes may have been when originally built or the fact that some of them now operate in a second or third line of defense, they lose their innocence and impotence when they are all "tied in" together and "constitute a single structure" and each unit serves "to strengthen, sustain and support the whole structure." The situation in principle is not unlike that which would have been presented if each of the defendants here involved had built "a single structure" across the easterly channel by each building a few hundred feet of the dike, or by each building its portion of the dike on top of that built by another defendant or by all the defendants working together as a unit in the building of the offending structure. The net result in all these supposed cases is to produce "a single structure" which wrongfully accomplishes a given result to the plaintiffs' damage. Under such circumstances all those who participated in building the structure may properly be said to have contributed to the resultant damage. In view of the allegations of the amended complaint that these dikes were "tied in" with each other, that they "constituted a single structure" and that each unit serves "to strengthen, sustain and support the whole structure" it cannot be held on demurrer, contrary to such allegations, that the acts of some of the defendants in building particular dikes which made up the completed structure did not contribute to the injuries sustained by the plaintiffs.

It is also alleged that the plaintiffs are unable to determine whether the damage sustained by them was occasioned as a concurrence of the acts of all of the defendants or was caused in part by the acts of certain of the defendants and in part by acts of other defendants and hence they are in

doubt as against which of the defendants they are entitled to redress, the extent thereof, and as to whether such liability is joint or several. These questions can only be determined by the evidence upon the trial. But the plaintiffs are entitled, under the circumstances here disclosed, to join all the defendants and have these questions determined in one trial. (Code Civ. Proc., §§379a and 379c; *Morris* v. *Duncan* (1936), 14 Cal.App.2d 635 [58 P.2d 669]; *Kraft* v. *Smith* (1944), 24 Cal.2d 124 [148 P.2d 23].)

 It is argued by the district and county that these two public bodies are exempt from liability for any damage caused the plaintiffs by the construction and manitenance of their respective dikes. Their theory is that these dikes were constructed for flood control purposes under the police power and that any damage resulting from improvements made for this purpose is *damnum absque injuria*. In view of the extended consideration given this question in *Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19, and *Rose* v. *State of California, supra,* it would seem unnecessary to cite and attempt to analyze earlier cases on the subject since they all appear to have been cited and considered by the court in those two cases. In the Archer case the court said (pp. 24-25) : "It is established in California and other jurisdictions that a lower owner has no right of redress for injury to his land caused by improvements made *in the stream* for the purpose of draining or protecting the land above, even though the channel is inadequate to accommodate the increased flow of water resulting from the improvements." (Italics added.) But, said the court (p. 26) : "The improvements must follow the natural drainage of the country. If the water is diverted out of its natural channel and discharged into a different channel or upon neighboring land, the diverter is liable to the owner whose land is injured by such discharge." The court further pointed out that (p. 28) : "Any damage caused by an obstruction to the natural flow of waters is also actionable." In that case, however, there was no evidence of diversion.

The above quoted language is directly applicable here. The amended complaint alleges that, by reason of the structures erected by the district in the easterly channel, the waters naturally flowing therein were excluded therefrom and diverted to the other channels from which they overflowed and damaged the plaintiffs. A similar factual problem is pre-

sented in the fourth cause of action for it is there alleged that the offending dikes were erected "in and across substantially the whole of the westerly channel" thereby causing "substantially all of the waters" to be diverted into the middle channel where they overflowed onto plaintiffs' land. Such interference with the natural flow of the water into and in the respective channels is not, under this decision, such an exercise of the police power as will relieve the district and the county from liability for injuries caused thereby.

The decision in the Archer case insofar as it relates to the question of immunity from liability for damages occasioned by the exercise of the police power was further amplified in the Rose case, *supra*. After extensively reviewing the purpose, as well as the nature and extent of the protection afforded by section 14 of article I of the state Constitution, the court proceeds to consider the police power, concerning which it says (p. 730) : "Defendants contend that even if plaintiffs were damaged, the damaging occurred as the result of the exercise of police power and is *damnum absque injuria*. This contention is wholly without merit as there is no basis for the application of the police power doctrine to the factual situation in this case.

"Generally, it may be said that police power operates in the field of regulation, except possibly in some cases of emergency such as conflagration or flood when private property may be temporarily used or damaged or even destroyed to prevent loss of life or to protect the remaining property of an entire locality. There is obviously no element of regulation involved in the case at bar, and no suggestion of anything in the nature of an emergency. The damage to plaintiffs' property here involved was the result of a public improvement constructed by the state in the exercise of its power of eminent domain.

"While it is true that the seeming absolute protection against the taking or damaging of private property for public use provided for in section 14 of article I of our Constitution may be qualified by the police power in the area in which such power operates, it should be obvious that the police power doctrine cannot be invoked in the taking or damaging of private property in the construction of a public improvement where no emergency exists. To hold otherwise would in effect destroy the protection guaranteed by our Constitution against

the taking or damaging of private property for a public use without compensation.''

In the light of this authoritative pronouncement it is apparent that simply because the district constructed the dikes in question for the purpose of flood control does not make it immune from liability for damage inflicted thereby upon the plaintiffs. There was here no emergency requiring split-second action. That no emergency existed is shown by the fact that some six years elapsed between the construction of the flood control dike and the flooding of plaintiffs' property in 1938. During this period the district had ample time and opportunity to make adequate provision for the care of the diverted waters and for the protection of plaintiffs' property. It was simply a choice of means deliberately made by the governing board of the district in selecting one method of controlling possible future floods as against another. The board of course was competent to make the choice but this does not mean that, under the circumstances alleged in the amended complaint, the district can escape liability for the consequential damages suffered by the plaintiffs. Ironically enough, the plaintiffs were not only subjected to the burden of assuming the consequences of future floods, but they were taxed on the same basis as those more favored citizens of the easterly section for the cost of erecting and maintaining the very instrumentalities which worked to their damage.

■ The district makes the contention that it is not liable by reason of the construction and maintenance of the flood control dike (across the easterly channel), or the westerly dike (by which the water was diverted into the middle channel). This contention is based upon the theory, so far as flood control dike is concerned, that the easterly channel had been completely shut off for a period of years by the other dikes which had been constructed by the railroad companies and the county, and thereby the westerly channel had become and was the natural watercourse for all the waters of the Tujunga River, including those formerly flowing in the easterly channel. As a result, it is argued, when the district constructed its dike it merely improved the banks of a natural watercourse which anyone may lawfully do.

It is to be noted that the easterly channel did not cease to be a natural watercourse simply because all the waters were diverted therefrom by the dikes erected and maintained by the county and railroad companies. On this point it is said

in 25 California Jurisprudence, page 1038, section 38, that: "A watercourse does not lose its character as such by reason of the fact that it is improved by deepening or is artificially controlled, nor because it is used as a conduit to carry other waters. Again, the character of a watercourse is not changed by the fact that a pond is created by a dam. *Nor does a watercourse lose its character as such because all the water has been diverted therefrom, no matter for how long a period,*—although such diversion may deprive lower riparians of their rights,—nor by reason of the fact that the water has all been dammed at a place far up the stream. . . ." (Italics added.)

The district, in support of its contention, relies principally on *San Gabriel V. C. Club* v. *Los Angeles County* (1920), 182 Cal. 392 [188 P. 554, 9 A.L.R. 1200]. But the decision in that case did not turn upon any question of diversion. The character of the channel—whether natural or artificial—does not appear to have been an issue in the case. The case simply involved an improvement *in the channel* by which the speed of the water was accelerated but without any water being added.

The district also cites *Chowchilla Farms, Inc.* v. *Martin* (1933), 219 Cal. 1 [25 P.2d 435], on this point. That was an action between riparian proprietors involving the right to water. The court held that the doctrine of riparian rights was applicable to a watercourse artificially created, but there is nothing in the opinion indicating that one who diverts water from a natural watercourse into another channel from which it escapes by reason of the insufficiency of the latter to hold and carry the same is not liable in damages to persons injured thereby. The case of *Matheson* v. *Ward* (1901), 24 Wash. 407 [64 P. 520, 85 Am.St.Rep. 955] is also relied on. In that case all the waters naturally flowing in the west channel of the Dungeness River were diverted to two other channels thereof and this situation continued for some thirty years. Thereafter, the defendants attempted to remove the diverting dam and cast the waters back into their original channel which would have resulted in damage to the plaintiffs. The court properly held this could not be done and the principle finds approval in *Natural Soda Products Co.* v. *City of Los Angeles* (1943), 23 Cal.2d 193 [143 P.2d 12]. But nothing in those cases warrants the conclusion that if a property owner has

been injured as the result of the original diversion, damages may not be recovered therefor. If plaintiffs here were seeking to compel the defendants to return to the easterly channel the waters naturally flowing therein prior to the construction of the dikes in question the Matheson case might be in point.

The state of repair of the dikes which had been built across the easterly channel is not stated in the amended complaint but it is clear from the allegations that the flood control dike was constructed, not for the purpose of improving the bank of the stream, but, according to the allegations, ''for the purpose of strengthening and reinforcing'' the other dikes and ''in order to more effectively and permanently obstruct the entrance of the easterly channel.'' From these allegations it is clear that the flood control dike was built in order to make the diversion of the waters which were wont to flow down the easterly channel both complete and permanent.

Where a natural watercourse is obstructed the diverter is under the continuing duty of providing proper facilities for handling the diverted waters so as to prevent damage to the property of others. (*Mitchell* v. *City of Santa Barbara, supra,* p. 572; *Wilson* v. *Boise City* (1899), 6 Idaho 391 [55 P. 887]; *Willson* v. *Boise City* (1911), 20 Idaho 133 [117 P. 115, 36 L.R.A.N.S. 1158]; *Atchison T. & S.F. Ry. Co.* v. *Jones* (1903), 110 Ill.App. 626.)

The district's argument, in effect, that its westerly dike by which water was diverted into the middle channel was simply the improvement of the bank of the stream and that by its existence for a period of some years the middle channel had become the natural channel of the stream is lacking in persuasiveness. It does not appear from the allegations in the amended complaint that this dike was a part of any bank of the stream which it might be said to improve. In fact, quite the contrary would appear from the allegation that it was constructed ''in and across substantially the whole of the westerly channel.'' It is further alleged that this dike was constructed ''for the purpose of diverting and it did divert substantially all of the waters then flowing in the westerly channel of said river to and into the middle channel.'' Under such allegations it is difficult to see how this dike could either be considered as an improvement of the bank of the westerly channel, or as a part of the bank of that channel.

The city and the department also invoke the principle that a person may improve the banks of streams without incurring

liability as justification for their acts in building the city dike which is on the streamward side of and immediately contiguous to the district's westerly dike. The "bank" which they claim to have improved is the westerly dike. But since that dike, under the allegations of the amended complaint, does not constitute a bank of a stream their argument necessarily falls.

The city and department seek to escape liability for the erection and maintenance of the city dike by reliance upon the "common enemy doctrine" applicable to flood waters. That principle is not here applicable. They point out that the city dike was erected on their property and then assert that it was built for the purpose of preventing damage to their property by waters escaping from a natural watercourse. This assertion is not justified by the allegations in the amended complaint. It is alleged in the fourth cause of action, which is the one that deals with the city dike, that it "was constructed by the defendants, The City of Los Angeles and Department of Water & Power of the City of Los Angeles, for the purpose of strengthening and reinforcing the westerly dike, and in order to more effectively divert the greater portion of the waters flowing in the westerly channel of the Tujunga River to and into the middle channel of said river . . . ." This allegation makes the purpose for which the city dike was constructed perfectly plain.

The waters in the Tujunga River with which the city dike interfered were flowing in a natural watercourse and hence do not come within the definition of flood waters. In *Everett* v. *Davis* (1941), 18 Cal.2d 389, 393 [115 P.2d 821], the court, quoting from *LeBrun* v. *Richards* (1930), 210 Cal. 308, 315 [291 P. 825, 72 A.L.R. 336], says that " 'Flood waters are those which escape from a stream or other body of water and overflow the adjacent territory.' " The court goes on in the Everett case to say that "the drastic rule which allows a property owner to divert such waters to the lands of others only applies to flood waters in the strict sense, that is, waters escaping because of their height from the confinement of a stream and running over adjacent property." This proposition finds specific support in *Thomson* v. *La Fetra* (1919), 180 Cal. 771, 773 [183 P. 152], and in *Mitchell* v. *City of Santa Barbara, supra,* p. 572. That the city and department did not have the right under the common enemy doctrine relating to flood

waters to construct and maintain the city dike so as to divert the waters from the westerly channel into the middle channel to the plaintiffs' damage is further demonstrated by what the court said in *Weinberg Co.* v. *Bixby* (1921), 185 Cal. 87 [196 P. 25], and in *Hellman etc. Bank* v. *Southern Pac. Co.*, *supra*. In the former case, at page 95, the court points out that: "The doctrine of the common law relating to protection against flood overflow of rivers, and which has been adopted by the California courts, recognizes such flood waters as a common enemy which may be guarded against or warded off by one whose property is invaded or threatened, by obstructions which are merely defensive in their nature and not calculated to interfere with the current of the water in its natural channel." At page 96 the court made this further statement on the point: "We recognize the limitation in all of these cases that *such right of self-protection does not permit of any obstruction of or interference with the natural channel of the stream or diversion of the flow of the water in such channel.*" (Italics added.)

In the Hellman case, the court, speaking of the easterly channel of the Tujunga River involved in the case at bar, as well as the construction therein of some of the very dikes involved herein, had this to say regarding the right to divert the torrential or even the exceptional and unprecedented flow of waters from their natural channels (p. 634): "The next contention of the appellants is that the trial court erred in its instruction to the jury as to the rights of the defendant to dike off the torrential waters of said river from said East Wash or Wash No. 1 thereof. This, however, is but a repetition in another form of its former objection, since if the East Wash had become a permanent and established watercourse of said river, it would follow as a matter of logical consequence that neither the defendants nor anyone else would have the right to divert either the usual or the torrential, or even the exceptional and unprecedented flow of these waters from their natural and accustomed channels to another of the courses or channels of said river, if such diversion would result in precipitating upon the lands of the plaintiff an outflow of said stream which, but for such diversion, would in the main have pursued its way down the East Wash or channel thereof at a distance from, and without injury to, plaintiff's land."

From the foregoing it is clear that the waters flowing in

the various channels of the Tujunga River were not "flood waters" and therefore the "common enemy" doctrine is not applicable. The allegations in the amended complaint bring this case within the rule that one may not, by the erection of a dam or a dike in a natural watercourse, whether erected upon his own land or that of another with the latter's consent, divert the waters naturally flowing therein out of their natural channel to the injury of another.

Before passing to the final question it should be noted that the second count states a cause of action against the county on the ground that the dikes built and maintained by it constituted a dangerous or defective condition of which the county had notice and ample opportunity to remedy. The basis for such liability is found in section 2 of the Public Liability Act (Stats. 1923, p. 675; Deering's Gen. Laws, 1937, vol. 2, Act 5619). See, also, *Bauman* v. *San Francisco* (1940), 42 Cal.App.2d 144, 152 [108 P.2d 989].

 The final question is: When did the plaintiffs' cause of action accrue and when, therefore, did the statute of limitations begin to run. The answer must be either (1) at the time the structures were built by the defendants, or (2) when the injuries complained of were sustained.

It is clear from the allegations of the amended complaint that the defendants had permission to erect the various dikes where they were built. There is no claim that any of these dikes were upon property belonging to any of the plaintiffs. On the contrary, it appears that the properties of the plaintiffs alleged to have been damaged are situate at a considerable distance from said structures. No trespass was committed by the defendants by the mere erection of the dikes in question and no injury resulted to plaintiffs therefrom until March, 1938, when their lands were overflowed. Under such circumstances no cause of action accrued until that date and therefore the statute of limitations has not run. This conclusion is supported by the line of cases of which *Brush* v. *Southern Pac. Co.* (1920), 47 Cal.App. 54 [190 P. 216], is typical. In this case, plaintiff sought damages for the flooding of his property by the erection and maintenance of a bridge over a waterway or wash. The bridge which was permanent in nature was erected in 1884, but the damage to property did not occur until some 30 years later, in 1914. The defendant contended, as here, that plaintiff's cause of action was barred by the statute of limitations on the ground that

the action accrued at the time the bridge was completed. In holding this contention to be untenable, the court said (p. 57) : "Appellants contend that the cause of action of the plaintiff is barred by the statute of limitations, not having been begun within either two or three years following the erection of the bridge which was proved to be a permanent structure. They take the position that the limitation period for injury to land, under such circumstances, begins to run from the completion of the structure, although the injury may occur during periods of high water, during successive years thereafter. Appellants have misconstrued the nature of the present action. It is not one to recover for an injury, direct and resulting immediately, from the construction of the bridge, but relates to damages which were an after-result from the erection of that structure. In other words, the action for damages for the injury to the plaintiff's land, caused by the obstruction of the storm waters in San Dimas Canyon, as the result of the construction of the bridge by the defendants, is not for a trespass upon real property, but it is in the nature of an action upon the case at common law for a consequential injury. (*Daneri* v. *Southern California Ry. Co.*, 122 Cal. 507 [55 P. 243] ; *Hicks* v. *Drew*, 117 Cal. 305, 309 [49 P. 189].)

"The true rule as to the application of the statute of limitations in such cases is stated by Mr. Redfield in his work on Railways (sixth edition, volume 1, page 595) as follows: 'The general rule in regard to the time of the accruing of the action is, that when the act or omission causes direct and immediate injury, the action accrues from the time of doing the act; but where the act is injurious only from its consequences, as by undermining a house or wall, or causing water to flow back at certain seasons of high tide or high water, the cause of action accrues only from the consequential injury.' " On page 58 the court further said: "The authorities relied upon by appellants to the contrary deal with cases where injuries caused by permanent structures infringed immediately upon plaintiff's rights. Such instances are, where water is permanently polluted, streams immediately caused to flow back on adjacent land, and currents of a river turned aside by permanent dikes, at once begin to cut into the opposite bank. They do not deal with cases similar to the one at bar, where a permanent and lawful structure has for many years existed without any consequential injury resulting from its construction."

It will be noted that in the Brush case the court cited and relied on *Daneri* v. *Southern California Ry. Co.* (1898), 122

Cal. 507 [55 P. 243]. There, by reason of a levee erected by the defendants in the Los Angeles River, waters flowing therein were diverted therefrom and caused to cut a large channel through the lands of plaintiff which was located about six miles away. The court held that the cause of action accrued at the time of the injury and not on the completion of the levee. (See, to the same effect, *Hicks* v. *Drew* (1897), 117 Cal. 305 [49 P. 189].)

In *Ketcham* v. *Modesto Irr. Dist.* (1933), 135 Cal.App. 180 [26 P.2d 876], plaintiff sued to recover damages for injuries sustained as a result of seepage from an irrigation ditch. In passing on the question of when the statute of limitations began to run the court said (p. 191): "It is true that the statute of limitations for damage resulting from seepage of a canal begins to run from the time of discovery of such seepage and resulting damage, and not necessarily from the time of the construction of the ditch."

In support of their argument that plaintiffs' cause of action is barred by the statute of limitations defendants rely principally on *Williams* v. *Southern Pacific R. R. Co.* (1907), 150 Cal. 624 [89 P. 599]. The facts of that case are stated in the opinion as follows (p. 625): ". . . It alleged that plaintiff was the owner of a parcel of land in the town of Lompoc, extending along and to the center line of Laurel Avenue, a public highway; that on January 1, 1900, while plaintiff's predecessor in interest was the owner of the property, the defendant, a railroad corporation, without the consent of the owner, and without any condemnation proceedings, had entered upon the part of said land within Laurel Avenue, and laid a railroad track thereon; that ever since said last-named date the defendant had operated its railroad over said track, and occupied said lands within the lines of the street, to the exclusion of the plaintiff, thereby obstructing said street, and depriving the plaintiff of access and approach to the street, and diminishing the value of his premises in the sum of six hundred dollars." The court observed that the complaint alleged a trespass upon plaintiff's land and pointed out that under subdivision 2 of section 338, Code of Civil Procedure, an action for trespass upon real property must be commenced within three years after the accrual of the cause of action. The court held that the cause of action accrued at the date of the defendant's entry upon plaintiff's land. The principle of this case is sound but it is clearly distinguishable from the

case at bar. The Williams case involved a structure, the erection of which was wrongful and unlawful and constituted a trespass upon the property of the plaintiff and was productive of immediate injury and damage to the plaintiff. Here, however, the erection of the dikes did not constitute a trespass upon the plaintiffs' property and their presence alone did not operate to injure or damage their property. The injuries here complained of are purely consequential and appeared long after the dikes were completed. The different principles applicable to the two situations are stated in *Porter* v. *City of Los Angeles* (1920), 182 Cal. 515, at page 518 [189 P. 105], as follows: ". . . It is the settled law in this state that the three years' period of limitation for an action for trespass upon real property applies only where there is some entry upon the premises of the plaintiff or direct or intentional injury thereto, amounting to a trespass thereon, and does not apply to actions in which the injury caused to the plaintiff's real property is consequential only and arises from some lawful act of the defendant not done upon the plaintiff's property, but committed elsewhere, and causing as a consequence thereof some injury to plaintiff's property not arising from an entry thereon by the defendant or his agencies." This principle should apply in determining when the statute of limitations starts to run in these cases, irrespective of whether the liability of a particular defendant is based on negligence or on section 14 of article I of the state Constitution, since, in either case, the damage is consequential in nature. To hold otherwise would be to say that the right of the plaintiffs to recover damages for the injuries they have sustained vanished before they ever had an opportunity to assert it.

Plaintiffs' causes of action are all at law; they seek no equitable relief. Therefore, laches, which the defendants set up as a ground of demurrer, does not lie. (*Brownrigg* v. *De Frees* (1925), 196 Cal. 534, 549 [238 P. 714]; *Western Machinery Co.* v. *Graetz* (1941), 42 Cal.App.2d 296, 300 [108 P.2d 711].)

Each of the judgments is reversed with directions to the trial court to overrule the demurrers of the respective defendants to the several causes of action.

Desmond, P. J., and Wood (Parker), J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied December 28, 1944.