[L. A. No. 3796. In Bank.—October 21, 1916.]

A. N. JONES, Respondent, v. CALIFORNIA DEVELOP-
MENT COMPANY (a Corporation), Defendant, LA
SOCIEDAD DE YRRIGACION Y TERRENOS DE LA
BAJA CALIFORNIA (SOCIEDAD ANONIMA) (a Cor-
poration), Defendant and Respondent; IMPERIAL
WATER COMPANY No. 1 (a Corporation), Defendant
and Appellant.

WATER — CONTROL OF UNPRECEDENTED FLOODS — LIABILITY OF LAND
OWNER FOR CONSEQUENTIAL DAMAGES—REASONABLENESS OF MEANS
OF CONTROL.—In all cases of extraordinary water conditions, whether
created by the ocean or by unexpected and unprecedented floods,
the land owner may use every reasonable precaution to avert injury
from his land, and whether or not his conduct be reasonable will
be determined by existing conditions and not by after consequences,
so that if the acts of the land owner be, in the light of the exist-

ing circumstances, not unreasonable, he will not be held liable for consequent damage which by these reasonable acts may be inflicted upon another land owner. The acts of protection themselves may differ in kind and character, but however they may differ, the test of the doer's legal liability is: Was the particular act which he did reasonable in view of the existing circumstances?

Id.—Overflow of Colorado River — Drainage of Flood Waters— Deepening of Channel of Stream.—In this action, involving the question of the liability of a private land owner in Imperial Valley, who by artificial means aided in deepening a natural channel of a stream for the purpose of draining off and controlling unprecedented flood waters which had escaped from the Colorado River, it is held that, under the circumstances of the case, the land owner's conduct was reasonable, and that he was not liable for consequential damages to other land owners.

APPEAL from a judgment of the Superior Court of San Diego County, and from an order refusing a new trial. W. R. Guy, Judge.

The facts are stated in the opinion of the court.

Joseph L. Lewinsohn, W. N. Goodwin, and Hunsaker & Britt, for Imperial Water Company No. 1, Appellant.

Luce & Luce, for Plaintiff and Respondent.

W. B. Mathews, and S. B. Robinson, for Defendant and Respondent La Sociedad de Yrrigacion de la Baja California (Sociedad Anonima).

HENSHAW, J.—Plaintiff on his own behalf and on behalf of his assignors, one and all owners of land in Imperial Valley, brought this action to recover damages for injuries sustained by their lands because of the asserted negligent and unlawful acts of the defendants. Plaintiff recovered judgment and from that judgment and from the order denying its motion for a new trial the defendant Imperial Water Company No. 1, a corporation, has appealed. The controversy cannot be understood without a presentation of facts in most respects remarkable, in some respects unique.

The great Colorado River, draining a large portion of the southwestern United States, and corresponding in this respect to the Mississippi, leaving the United States on its

southerly course passes through northern Mexico and empties its waters into the head of the Gulf of California. In the past ages it has deposited enormous quantities of silt in what was then the upper waters of the Gulf of California, until it finally reclaimed a vast territory from the waters of that gulf. But it did this, not in the usual way of depositing detritus, until new land rose above the level of the ocean, but rather by forming a barrier of high land to the southward, this barrier being erected by the collision between the tidal, sand-carrying waters of the gulf and the silt-carrying waters of the river. The result was the formation of what was long known as the Colorado Desert. With that portion of the Colorado Desert to the west of the river, now bearing the name Imperial Valley, and now erected into a county of this state known as "Imperial," we are here concerned. The effect of this curious action of the elements was to leave Imperial Valley a waterless waste below the level of the ocean. While the general course of the Colorado River was south into the head of the Gulf of California, the land gradient of Imperial Valley was in an opposite direction northward, so that from the Mexican line Imperial Valley slopes down toward the north at a gradient of four to six feet to the mile. At the northern end of the valley is Salton Sink, which was and for some years had been a dry depression, from 250 to 275 feet below the level of the sea. The Colorado River from the neighborhood of the Mexican border southward carries its waters somewhat sluggishly through this higher land to which reference has been made. Late spring or early summer is the period of normal high water in the Colorado River, and at such seasons it is not unusual for it to overflow its westerly bank, where the waters, gathering in natural depressions locally known as lakes, flowed from these depressions in a northerly direction by two natural channels toward and, upon occasion, into the Salton Sink. The nearest to the river of these natural waterways leading from Mexico northward was known as the Alamo River, and the channel farther to the west was called New River. The distance between these two waterways at the international line is about eight miles. The distance from the boundary to Salton Sink along the course of New River is approximately forty miles. In its natural state, and before the occurrences hereinafter narrated, the chan-

nel of New River was from two to eight feet deep, with an average width of forty feet. The Alamo River channel was similar to it in size and characteristics, saving that the course of the Alamo was a little more direct, its channel, consequently somewhat shorter, and its gradient a little steeper. The soil of Imperial Valley is a soft, friable silt, the climate extremely warm, the atmosphere very dry, the rainfall negligible. Under these conditions, of course, enormous quantities proportionately of the waters that found their way into the Alamo and New Rivers seeped into the soil or were taken into the air by evaporation. So that, as has been said, while the terminal flow of these waters was Salton Sink, for some seven or eight years before the happening of the events to be recorded Salton Sink was dry.

Upon an examination of the soil it was found that Imperial Valley, though without vegetation, was a desert only for lack of water. Further, it was found to be a practicable engineering feat to tap the Colorado River near the international boundary line and through canals carry and put the water by gravity upon the lands of Imperial Valley both in Mexico and in the United States, the general course of these canals following the land gradient northerly and their surplus water flowing into the Salton Sink. This engineering feat was performed by the defendant the California Development Company, and the application of the water to these lands, taken with the climatic conditions, showed an amazing fertility and productivity of the soil. Irrigated farms were laid out and sold, towns sprung up, a railroad was constructed, and in verity this desert was made to blossom like the rose. The defendant Imperial Water Company No. 1, which will for convenience be called the water company, is a mutual company organized for the purpose of acquiring water for distribution to its stockholders upon the land owned by them within the territory lying north of the Mexican line and between the channels of the Alamo and the New Rivers. It was the purveyor of water to approximately one hundred thousand acres, taking this water by purchase from the canals of the California Development Company. It had 736 individual stockholders. It was supplying water to these stockholders upon their tracts of land varying in acreage from six to three hundred and twenty. It had its own checkerboard system of canals and irrigating

ditches, aggregating more than three hundred miles in length. The towns of Calexico, Heber, El Centro, Imperial, and Brawley, extending from Calexico upon the border northerly, were all within the territory of the water company. The lands were protected from the invasion of waters from New River by levees.

In the spring of 1904 the defendant California Development Company cut a new headgate to divert water from the Colorado River a few miles below the international boundary line. This cut through the silt formation was inadequately protected. The result was that the Colorado River, eating through and around the protecting headgates, soon was beyond control. It eroded the canals, spread over the country, and finding a steeper gradient in Imperial Valley to the northward than its normal course southward to the Gulf of California, left its old channel and proceeded to make a new one ending in Salton Sink, which by the inflow of these waters rapidly became a lake, and is now known as Salton Sea, a lake of more than four hundred square miles in area. The development company was using the Alamo waterway as part of its canal system, and, to relieve the pressure of these waters upon a dam on the Alamo, dug a channel from the Alamo to the New River waterway. The construction of this is charged upon the appealing defendant jointly with its codefendants, but it is unquestioned that it had nothing to do with this act, and the construction of this ditch is therefore out of the case, saving so far as that it aided in turning the waters to the New River channel and in relieving the Alamo channel from the tremendous erosion which subsequently took place in the channel of New River. Nevertheless, while the flow in the Alamo channel was controlled and never exceeded three thousand second-feet, this channel was eroded southerly from Salton Sea until it was thirty-five feet deeper and two hundred feet wider than formerly under normal conditions. From June, 1905, the waters of the Colorado River stood over the Imperial Valley and flowed down New River in ever-increasing volume, so that notwithstanding the enormous loss by seepage and evaporation Salton Sink, upon July 1, 1905, had received four hundred thousand acre-feet of water (an acre-foot being that quantity of water which will cover an acre to a uniform depth of one foot), while upon July 1, 1906, the sink was filled to a depth of

fifty-eight feet and held 7,380,000 acre-feet. The Colorado River, which, in October, 1905, was discharging into Imperial Valley vagrant waters to the amount of 483,118 acre-feet, steadily increased the quantity of this discharge, so that in March, 1906, the flow was 1,561,771 acre-feet; in April, 1,834,119 acre-feet; in May, 3,324,896 acre-feet and in June, 5,008,493 acre-feet.

The situation existing in the spring of 1906 was that for the first time in history the Colorado River had completely left its natural channel and was pouring all of its waters uncontrolled in and over the lands of Imperial Valley. Those lands upon the Mexican side were submerged and upon the California side, saving where protected by levees, were in like condition. More than sixty square miles of the valley north of the international line were inundated. The calamity was of more than local consequence. It was considered of national importance. The attention of the President and of Congress was directed to it, and, under assurances of repayment, the Southern Pacific Company was requested to use its best efforts to stem the torrent and return the river to its old channel. For more than six months the Southern Pacific Company had been endeavoring to do this thing, but without success. There was no certainty that the river could ever be controlled, and, if not, it meant the eventual filling, first, of the Salton Sink, and gradually of all the lands in the Imperial Valley, until the whole became a lake. Besides the private properties already inundated and thus threatened with destruction, the existence of the towns in the valley was equally imperiled. The quantity of water as the season of high water in the river approached was enormously increased. It was certain that the volume would steadily grow, and there was every reason to believe that within a short time the flow into Imperial Valley would be twice the existing flow. The lands of plaintiff and his assignors were all submerged and had been for a year. The lands of defendant and the towns temporarily protected by levees were in danger of like inundation. The water was finding its outlet into the Salton Sink principally by the channel of New River, and had already enlarged, deepened, and cut back that channel from Salton Sink southward twenty-five miles. Where cut, instead of the former insignificant watercourse, it was a gorge a thousand feet and more in width and from

seventy to a hundred feet deep. Thus it was manifest that these vagrant waters of the Colorado River were actively engaged in making for themselves an adequate channel for the carrying of their enormous volume. Moreover, it was apparent (in the event of the failure to divert the Colorado River back to its original channel) that the only relief from the actual and threatened inundation of these lands was by means of this new and adequate channel. About the middle of April, 1906, and for some weeks thereafter, the defendants development company and water company employed men who threw sticks of dynamite into the stream to clear away obstructions in the channel and to aid the force of the water in eroding a deeper channel.

The complaint charged and the court found (and this is the gravamen of appellant's offense) that there existed at various points along the course of New River certain reefs or riffles of hard-pan which rose nearly to the bottom of the bed of the original channel of Old River; that these riffles and reefs of hard-pan acted as natural dams and prevented, and would have prevented, the further deepening and widening of the channel to the southward by erosion; that if this natural condition had been allowed to remain, the water, standing in a vast lake over these inundated lands, would have drained off slowly and without appreciable injury to them; that the effect of this dynamiting was to shatter this hard-pan and thus to subject it to ready erosion; and that in turn the effect of this rapid erosion and widening and deepening of the stream was to cause the water standing upon plaintiff's lands to be drained off more rapidly than it would have been in the course of nature, and that the effect of this rapid withdrawal was to cause a gullying and erosion of the lands of plaintiff and his assignors. These acts of dynamiting are admitted. Concerning them the court found as charged in the complaint and as above indicated, and the judgment which it rendered in favor of plaintiff was based upon its findings to that effect—that the dynamiting was wrongful and was the proximate and efficient cause in producing the damage to the lands.

For reasons which will hereinafter appear we will do no more than refer to many of the attacks which appellant makes upon this judgment, as that the amended complaint, upon which trial was had, if it stated a cause of action at all

charged upon an entirely different cause of action from that pleaded in the original complaint, and that the cause of action charged upon was barred by the statute of limitations. Nor will we pause to consider the asserted insufficiency of the evidence to justify the findings, as that the reefs of hard-pan did not exist, or that if they did exist they were not of such character as in any way seriously to retard the erosive force of the water. Nor yet will we discuss the question of the insufficiency of the evidence to support the finding that the dynamiting of the channel was an efficient cause of the erosion, herein appellant asserting that as compared with the devastating power of the water itself, the acts of its men in throwing sticks of dynamite into the stream contributed no more to the inevitable result than these men would have contributed to it if they had tossed their hats into the mighty torrent. We pass over these matters to come to one consideration which is both determinative and fundamental. Herein assuming the truth and sufficiency of the findings in all other respects, the vital question is: Did the admitted acts of the defendant, the consequences being what they were, subject it to the legal liability here declared?

For the purposes of the consideration of this question the appellant may be regarded as a private land owner who by artificial means has aided in deepening the natural channel which the waters were making. Moreover, since the facts of this case are unique, it would be a waste of time to seek for adjudications where those facts are in any essential way paralleled. Equally useless would it be to review the innumerable decisions dealing with the drainage and flow of surface waters and of flood waters, the right of defense against the sea or vagrant waters as a common enemy, and the asserted conflict between the common law and the civil law upon all these and kindred questions. The case here presented, we repeat, is unique in its facts. If the waters were surface waters, they were something essentially more. If the waters were storm waters or flood waters, they differed radically from the ordinary storm or flood waters which in the course of nature would cease to flow. Here presented is the case of a mighty river leaving its channel and pouring and continuing to pour all its volume over the lands of a great and fertile valley. At first, and because of the lack of an adequate channel, these waters spread out and formed a vast

shallow lake. In time the waters themselves selected and proceeded to form an adequate channel. Unless the art and ingenuity of man could arrest this flow and restore the river once more to its natural channel, the outcome was inevitable. It meant the submergence and destruction of all property in Imperial Valley. Thus, as surface waters, these waters had stood upon the unleveed lands for more than a year. They were pressing upon the levees of the protected lands of appellant. Their volume, it was certain, would be enormously increased within a very short time, and unless an adequate channel was ready to receive these waters, their devastating effect upon the protected lands and towns was a matter of grave and serious apprehension. Temporary security could be assured only if the channel were made adequate southward to the Mexican boundary. Nature was doing her best to accomplish this, and the appellant aided her in the work. The result of their combined efforts was success. But this success worked injury to the lands long submerged, by causing the waters to withdraw from them with such rapidity as to eat away and gully the freehold.

Manifestly the acts of this appellant, and its right to do those acts, are not to be measured by the familiar, indeed the commonplace, principles touching the right to relieve one's self from or protect one's self against ordinary surface waters, or the ordinary recurrent flood waters, nor with attempted changes in natural conditions which impose either a greater servitude upon or work a positive injury to the lower lands bound to receive such waters, principles declared in such cases as *Los Angeles C. Assn.* v. *Los Angeles,* 103 Cal. 461, 37 Pac. 375, *Rudel* v. *Los Angeles Co.,* 118 Cal. 281, [50 Pac. 400], *Sanguinetti* v. *Pock,* 136 Cal. 466, [89 Am. St. Rep. 169, 69 Pac. 98], *Wood* v. *Moulton,* 146 Cal. 317, [80 Pac. 92], and *Heier* v. *Krull,* 160 Cal. 441, [117 Pac. 530]. The fact that in our decisions we have departed from what was conceived to be the rules of the common law, in favor of the more equitable principles of the civil law, does not mean that we are upon this or any other question irrevocably committed to the doctrines of either system of jurisprudence. This court has said that while the rules of common law are the basis of our jurisprudence where our own laws are silent, this means and can only mean that those rules will be recognized and adopted where they meet the conditions existing

in the state, and will not be allowed to control where the conditions were. those never contemplated by the common law. The same declaration applies to the principles of the civil law.    Indeed, upon these general questions, it has been well said by the learned author of "Water and Water Rights": "Therefore no arbitrary rule can be laid down which will govern all cases, but each case must be dealt with upon its facts, applying the rule which will be reasonable under the circumstances, under the general rule that the water should be allowed, as far as possible, to seek its natural outlet." (3 Farnham, sec. 889.)    And this is precisely what this court declared in *Lamb* v. *Reclamation Dist.*, 73 Cal. 125, [2 Am. St. Rep. 775, 14 Pac. 625], when it said: "The real question in such cases is, Had the party sued the right to do the thing complained of?"

The underlying principle governing the decision of all these cases which deal with extraordinary water conditions, whether created by the ocean or by unexpected and unprecedented floods, is that in such stress the land owner may use every reasonable precaution to avert injury from his land, and whether or not his conduct be reasonable will be determined by existing conditions and not by after consequences; so that if the acts of the land owner be, in the light of the existing circumstances, not unreasonable he will not be held liable for consequent damage which by these reasonable acts may be inflicted upon another land owner.    It follows herefrom that the acts of protection themselves may differ in kind and character, but however they may differ, the test of the doer's legal liability is: Was the particular act which he did reasonable in view of the existing circumstances?    Even in the civil law, upon which respondent here places great reliance, such was the principle governing the land owner's responsibility for his conduct, and the supreme court of the United States, pointing out that while in the Roman law the free flow of waters was secured from undue interruption and the land owners were protected from undue interference or burden created by obstructions to the flow, or by deflections in its course, etc., says, "while this was universally true, a limitation to the rule was also universally recognized by which individuals, in case of accidental or extraordinary floods, were entitled to erect such works as would protect them from the consequences of the flood by restraining the same, and

that no other riparian owner was entitled to complain of such action upon the ground of injury inflicted thereby, because all, as the result of the accidental and extraordinary condition, were entitled to the enjoyment of the common right to construct works for their own protection." (*Cubbins* v. *Mississippi River Commission*, 241 U. S. 351, [60 L. Ed. 1041, 36 Sup. Ct. Rep. 671].) In our own state the same principle has been invoked and declared whenever the occasion demanded it. Thus in *Lamb* v. *Reclamation Dist.*, *supra*, where the action was to abate and remove as a public nuisance a levee erected by the defendant against the flood waters of the river, the effect of which levee was to force an excess of these waters upon plaintiff's land to his injury, and where the contention was that the defendant had by its levee dammed the natural watercourse carrying water in times of flood, it was held: "Considering all the facts and circumstances of this case," and conceding that the construction of the levee did impose an additional burden upon and work an injury to the lands of plaintiff, that the defendant, for the protection of its own lands, was under the circumstances doing what it had a right to do, and the resultant damage to plaintiff's land was *damnum absque injuria*. In this case, it is to be noted, is quoted with approval *Rex* v. *Commissioners*, 8 Barn. & C. 355, and Lord Tenterden's language: "But the sea is a common enemy to all proprietors on that part of the coast. . . . I am therefore of opinion that the only safe rule to lay down is this: that each land owner for himself, or the commissioners acting for several land owners, may direct such defenses for the land under their care as the necessity of the case requires, leaving the others in like manner to protect themselves against the common enemy." To the same effect is *McDaniel* v. *Cummings*, 83 Cal. 515, [8 L. R. A. 575, 23 Pac. 795], where it is declared that the principle governing the decision in *Rex* v. *Commissioners*, declared in *Lamb* v. *Reclamation District*, "is the true principle to apply to the case" of the "flood waters of our large rivers." The principle is again announced and affirmed in *Gray* v. *Mc-Williams*, 98 Cal. 157, [35 Am. St. Rep. 163, 21 L. R. A. 593, 32 Pac. 976], where it is said: "In the case of flood waters escaping from natural streams, we view them, it is true, as a common enemy, against which we may protect ourselves without the commission of a wrong; but after all, this decla-

ration is used in view of the means of defense resorted to rather than in the abstract. We build the banks of the river higher for our protection, it is true, but in so doing we aid nature in her effort to carry the water to its ultimate destination, and he who to protect himself from a flood should erect a barrier across the channel of one of our important rivers, would probably be met with the declaration that it was not the proper mode of warfare, even against a 'common enemy.' " And once more is the same principle declared in *Sanguinetti* v. *Pock,* 136 Cal. 466, [89 Am. St. Rep. 169, 69 Pac. 98].

In these cases, alike in their vital characteristics, the defendants had protected their lands against flood waters by artificially raising the banks of the stream. The damage to plaintiff's lands followed in direct consequence. There was no question but that plaintiffs' lands were injured, but the governing principle under the application of which these plaintiffs were denied relief is that the steps which the defendants took to protect their own lands *were reasonable under the circumstances,* and the consequent damage to plaintiffs' lands cast upon defendants no legal liability. In each case it was *damnum absque injuria.* Applying this principle to the case at bar, what defendant did, instead of raising the bank of the stream, was to lower its bed. The effect of this lowering, instead of precipitating more water upon the lands of plaintiff was to cause a too rapid withdrawal of waters standing upon those lands. Under all the circumstances of the case, was defendant's conduct reasonable? Unhesitatingly we answer that it was, even in view of the finding of the court that the defendant "was not justified on the ground of public interest or on the ground of public good or greater public right, or on the ground of impending necessity, and no such right or no such necessity existed." The conditions have been outlined with sufficient elaboration. It is to be remembered that so far as these plaintiffs themselves are concerned, their lands had been submerged for more than a year. It cannot be doubted that in common with the owner of every other acre of submerged land they would have welcomed the assurance that the flood waters would be drained from their soil and the land once more made to appear. These lands, if not wholly, were for the most part unimproved. The threatened lands were

improved and productive. The apprehension of injury to these lands and to the towns which had grown up in their midst is abundantly shown by the evidence. The controlling consideration is not whether there was an absolute necessity for the doing of the act, but whether the doing of it was reasonable under all the circumstances, and we repeat that we entertain no doubt that it was.

This conclusion renders unnecessary, as has been intimated, the consideration of any of the other propositions advanced in this case. The fact that under the evidence here presented plaintiff has not established against this appealing defendant any legal wrong is determinative of the controversy, and the judgment and order appealed from are therefore reversed.

Shaw, J., Melvin, J., Lorigan, J., Sloss, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.