[Civ. No. 16017.   First Dist., Div. Two.   Nov. 17, 1954.]

L. S. WILLIAMS, Appellant, v. PACIFIC COAST AGGRE-
GATES, INC. (a Corporation), Respondent.

LeRoy A. Broun and Charles M. Samson, Jr., for Appellant.

Clark & Heafey, Edwin A. Heafey and Gerald P. Martin for Respondent.

KAUFMAN, J.—This is an appeal from a judgment denying appellant's claim for damages and an injunction against defendant and respondent, Pacific Aggregates, Inc. The first cause of action alleged negligence on the part of respondent in carrying on its mining operations proximately resulting in damage to appellant's crops from overflow waters. The second cause of action alleged a nuisance in that respondent erected and maintained dirt embankments resulting in an accumulation and diversion of water on respondent's property without providing means for said water to return to its natural course of flow, causing appellant's crops to be inundated and damaged in the sum of $36,518.84. The third cause of action alleged that the nuisance created by respondent caused irreparable damage to appellant and asked for an injunction directing respondent to provide means for the diverted water to return to its natural course of flow.

Plaintiff and appellant L. S. Williams had leased and was operating a ranch of approximately 170 acres near Centerville, on which he was raising cauliflower, which on the date here involved was in various stages of growth. Respondent owned a tract of land east and somewhat north of appellant's ranch, and for the five years prior to January 12, 1952, had been engaged in sand and gravel mining operations thereon. Alameda Creek, a natural watercourse, ran along the eastern boundary of respondent's land, continued around the northeast corner and along the entire northern boundary thereof in a westerly and northerly course, then along the northern

boundary of a tract of land north of appellant's ranch and west of respondent's land. This tract was operated as a sand and gravel business by Rhodes Jamieson Company.

At the juncture of the northwest corner of respondent's land with the southeast corner of the Rhodes Jamieson land and the northeast corner of appellant's ranch, on the south side of Alameda Creek is a triangular piece of property approximately 500 feet long and 250 feet wide, which was described as a "swale," or low area which is about 4 to 6 feet lower than the surrounding land.

The lands described above have a contour which slopes from the north and east to the south and west from Alameda Creek across the lands of respondent and appellant, although the northern part of respondent's lands bordering the creek are lower in elevation than the southern part. On the eastern side of respondent's property on the west bank of Alameda Creek was an old levee constructed by the Western Pacific Railroad Company. Respondent in its mining operations removed the top soil and placed it on the north side of its property along the south creek bank, creating a levee, and on the east side of its property made similar deposits, extending the Western Pacific levee. A similar embankment was created along respondent's west boundary, then for a short distance south and east where it tapered off to form a runway for trucks to run on top of the embankment. The remainder of the southern boundary was open.

The Rhodes Jamieson Company also had a levee on its northeastern boundary extending across the mouth of the triangular piece of property described above as a swale. This joined respondent's embankment on the northwest corner, although it was not as high a levee on respondent's.

West of appellant's property is a low area south of Alameda Creek, known as Crandall Slough, which takes flood waters from the general area, and when filled has sometimes spilled water onto the west side of appellant's property.

The evidence herein showed that in 1911 Alameda Creek had flooded the property now being formed by respondent, and the westerly part of appellant's property. In November, 1950, there had been a small overflow of the creek on the north side of respondent's property covering about 30 acres, which subsided and returned to the creek.

On January 12, 1952, between 8 and 10:30 a. m. Alameda Creek overflowed its banks on the east side of respondent's property breaking through part of the Western Pacific levee

and the extension built by respondent, filled the gravel pits, and inundated the entire property sometime between 5 and 7 p. m. of that day. The Rhodes Jamieson levee was also washed out at about 8 a. m. the same day, and the low swale at the northwest corner of respondent's land was filled with water, and the Rhodes Jamieson property was partly inundated.

The embankments created by respondent formed a catch basin for the flood waters which, at about 4:30 p.m. on January 12, broke out through the embankment on respondent's western boundary and flowed in a wave across appellant's banks, completely submerging his crops and washing away soil.

It was stipulated at the trial, and the court found, that all of the waters here involved were flood waters.

The trial court found that the pressure of continued inflowing of water from Alameda Creek caused these overflow waters to leave respondent's land on the southwest side and flow across appellant's land, and that it was true that the soil deposited by respondent on its western boundary prevented the flood waters from returning to the creek on the natural contour of the land, and caused them to flow onto appellant's land.

The court also found that it was not true that a natural watercourse traverses, or ever had traversed, respondent's property and that the damage was not caused by the obstruction of a natural watercourse. It was further found that even though the banks created by respondent on its north and west boundaries obstructed the natural outlet for surface waters, still the pits created by respondent could hold 1,500 acre feet of water and were more than adequate to accommodate run off of surface waters.

The court found that the proximate cause of the damage to appellant was "the unusually heavy flow of water in Alameda Creek and the break in the levee at the eastern and upstream boundary of defendant's property which allowed the flood waters to enter defendant's property, and subsequently to flow upon and across the land of plaintiff."

The findings further stated that "even though the damage . . . would not have occurred if defendant did not deposit top soil . . . on the western and downstream boundary of its property, nevertheless the consequences of the deposit . . . would not reasonably have been foreseen by a person of ordinary prudence and intelligence in the light of all the evidence," and that it was true that the banks of soil caused

the water to accumulate and form a body of water higher in level than the surrounding land, and higher in level than would have existed except for the banks.

It was further found that respondent did not conduct its mining operations in a negligent manner, nor that said mining operations caused any diversion of waters from Alameda Creek, that respondent did not maintain a nuisance on its property by reason of its mining operations.

Appellant contends that the uncontroverted evidence establishes that respondent was negligent when it constructed the soil embankments without providing outlets for a return of the overflow water to the natural channel of the creek. It is argued that respondent knew, because of the heavy flood of 1911, and the flood in the rainy season of 1950-1951, that its properties would occasionally be invaded by flood waters, and that it was under a duty to construct its banks in a manner that would permit the flood waters to return to the creek. It is clear that if the damage in the instant case had been caused by surface waters, respondent would have been liable for accumulating them and causing them to be precipitated onto appellant's land. (*Everett* v. *Davis*, 18 Cal.2d 389 [115 P.2d 821] ; *Le Brun* v. *Richards*, 210 Cal. 308 [291 P. 825, 72 A.L.R. 336] ; *Thomson* v. *La Fetra*, 180 Cal. 771 [183 P. 152].) Appellant says that the issue, then, is whether this rule should be changed when the waters involved are flood water. ■ The "common enemy" rule has been applied in this state where flood waters are concerned, and one owner may protect his property by levees despite the fact that waters are thereby forced upon another's land. (*Jones* v. *California Dev. Co.*, 173 Cal. 565 [160 P. 823, L.R.A. 1917C 1021] ; *Mogle* v. *Moore*, 16 Cal.2d 1 [104 P.2d 785] ; *McManus* v. *Otis*, 61 Cal.App.2d 432 [143 P.2d 380].) ■ However, if waters are diverted from the natural channel of a stream or a natural watercourse is blocked so as to discharge waters upon another's land the party causing such diversion or obstruction is liable. (*Shaw* v. *Sebastopol*, 159 Cal. 623 [115 P. 213] ; *Los Angeles Brick etc. Co.* v. *Los Angeles*, 60 Cal.App.2d 478 [141 P.2d 46] ; *Smith* v. *Los Angeles*, 66 Cal.App.2d 562 [153 P.2d 69].) Appellant says that the "common enemy" rule can have no application here, for the purpose in constructing the banks was merely a convenient disposition of the top soil to prevent flooding. The eastern and northern embankments constituted levees along the creek banks, but the western bank and partial southern bank did not border the creek. Respondent points out

that, in the small flood of 1950, waters overflowed about 3 acres of respondent's land on the north. It would therefore have been foolhardy for respondent to have cut openings in this northern bank, which would result in letting in the flood waters upon respondent's land. The parties argue at length as to whether the water would have returned to Alameda Creek because of the high level of water in the creek at the time, and much conflicting evidence is cited. However, that conflict has been settled in favor of appellant by the trial judge's finding that the banks created by respondent on the western boundary of its property prevented the flood waters from returning to Alameda Creek. ■■ But the court held that the consequences herein would not reasonably have been foreseen by a person of ordinary intelligence and prudence in the light of all the evidence. It cannot be said that this finding is unsupported. This was the first flood since respondent had created the levees. Only once since 1911 had this property been flooded and then only a few acres on the low north side. It would therefore seem reasonable for respondent to build a bank on that side which would prevent flooding and which apparently succeeded in 1952 in preventing flooding from that direction. It cannot be said as a matter of law that respondent should have foreseen that the levee on the eastern boundary would break, that the flood would continue to rise and press against the waters impounded by the other banks until the impounded waters reached a level higher than appellant's land. The trial judge's holding that the final result of respondent's acts was not foreseeable is therefore controlling.

■■ Appellant contends also that respondent was negligent in not cutting outlets in the banks to allow the waters to escape during the hours when the water was accumulating and before it reached the level higher than appellant's land at about 4:30 that afternoon. It is noted that there was evidence that ranch superintendent in that area, a Mr. Shanks, had, sometime between 8:30 and 10:30 that morning, gone to respondent's plant and told some of the shop personnel that they should cut the levee on the other side, evidently indicating the levee on the northwest corner of respondent's land, the lowest elevation of its property.

An engineer who testified for appellant stated that at noon on January 12, 1952, the waters in Alameda Creek raised about 4 feet in an hour and a half, then continued to rise until the peak flow was reached at the Niles gage upstream

from respondent's property at about 4 p. m., and struck respondent's property at about 4:30 p. m. Between 5 and 7 p. m. the water overflowed onto appellant's land. Another engineer who testified for respondent discussed the advisibility of cutting through the levee to allow the impounded water to escape, and said that it could be a very hazardous procedure, that it might result in tremendous amounts of water flowing out of the creek and damaging adjoining property.

It cannot be said as a matter of law, therefore, that respondent should have realized that by cutting the banks the danger could have been averted, nor can it be said as a matter of law that respondent had a reasonable opportunity to have accomplished this under the conditions then prevailing on its own property.

The case of *Cox* v. *Odell*, 1 Cal.App. 682 [82 P. 1086], cited by appellant, holds that a defendant in constructing an embankment was bound to consider the effect upon his neighbor's land in the event of heavy rains, which were not infrequent in the area involved. Defendant did not exercise sufficient care in the maintenance of the embankment either in strength or in providing outlets in case of storm. His neglect in regard to the manner of construction and failure to provide outlet for the water was held to be the proximate cause of the injury. In the instant case, however, surface waters were adequately provided for, and the court so found. It, was stipulated in this case that all the waters involved were flood waters. Appellant feels that the rule of the Cox case in regard to surface waters should be extended to flood waters. But this state had always upheld the "common enemy" doctrine where flood waters are concerned. ▪ Presumably, a party under this rule might erect necessary barriers against flood even if they did interfere with the natural flow of surface water, providing adequate provision had been made for surface water, as here, so that it was not discharged on the neighbor's land. Furthermore, the action of flood waters is much more unpredictable than that of surface waters. In the present case of course it is true that the western boundary which did not border the creek could hardly be construed to be a levee erected to prevent flooding. Nevertheless, the waters which were blocked by it were flood waters, hence the rule of the Cox case cannot be applied.

Appellant concedes that there is no California case similar to this. He cites *Crawford* v. *Rambo*, 44 Ohio St. 279 [7 N.E. 429], and asks that the rule in that case be adopted

here. But we believe that the trial judge herein did apply the rule there stated, which is that a party should not be held liable for the unforeseen results to his neighbor if he constructs an embankment for the benefit of his own land, if he exercised the care and skill of an ordinary skilful and intelligent man in constructing it; but if the occurrence of an ordinary flood has demonstrated that the effect of the embankment is to cause injury to adjoining land, and that a recurring flood will cause additional injury, "the duty on his part at once arises to obviate the cause of the injury; and if he fails to do so, his liability from such time must, upon principle, be the same as it would have been could he have foreseen the result in the first instance." The trial judge herein, in his "Notice of Decision" stated: "Having in mind the knowledge which defendant now possesses, it would appear that under well established principles of law, the defendant might in the future be held liable for resultant damages to plaintiff's crops unless it takes reasonable corrective steps."

It is argued that the findings of fact are inconsistent *inter esse* and do not warrant the conclusions of law or the judgment. The court found that the top soil deposited by respondent on its western boundary prevented the flood waters from returning to Alameda Creek on the natural contour of the land, causing them to flow onto appellant's land and that the damage would not have occurred but for such deposit of soil. It is claimed that the finding that the proximate cause of damage was the unusually heavy flow of water in Alameda Creek and the break in the levee on the eastern boundary, is inconsistent. However, findings similar to these were held not to be inconsistent in *Sutliff* v. *Sweetwater Water Co.,* 182 Cal. 34 [186 P. 766].

Appellant maintains that the "common enemy" doctrine is not applicable here since the embankments were not constructed for defense against flood, but merely for business convenience. We do not find that the trial judge decided the case on the basis of the "common enemy" doctrine— that respondent was not liable because its structures were defenses against flood—but rather on the theory that respondent was not negligent in creating these embankments because a man in the exercise of ordinary care and skill and intelligence would not have foreseen the unusual results.

*Costello* v. *Bowen,* 80 Cal.App.2d 621, 629 [182 P.2d 615], is cited for the rule that defensive obstructions may be con-

structed against flood waters provided they do not interfere with the current of the water in its natural channel. The finding herein is adequately supported that respondent did not divert or obstruct the waters of a natural watercourse. Also fully substantiated by the evidence are the other findings attacked as unsupported,—that the cause of the damage was unusually heavy flow of water and the break in the levee, and that the consequences of the deposit of the topsoil on the western boundary by respondent would not reasonably have been foreseen by a person of ordinary prudence and intelligence in the light of all the evidence.

It is suggested that the rule of absolute liability should be applied in this case, citing *Green* v. *General Petroleum Corp.*, 205 Cal. 328 [270 P. 952, 60 A.L.R. 475]. In that case an oil company was held liable for a "blow-out" resulting from the drilling of an oilwell where it was not negligent in the drilling operations but where it was known to defendant company that a tremendous pressure of gas underlay the particular locality. It was clear in that case that the injury could be foreseen and there was no interposition of an external or independent agency. The cases of *Parker* v. *Larsen*, 86 Cal. 236 [24 P. 989, 21 Am.St. Rep. 30] and *Kall* v. *Carruthers*, 59 Cal.App. 555 [211 P. 43], are cited by appellant, but these cases deal with percolating waters used for irrigation purposes which were brought onto the defendants' lands by artificial means. In the instant case the water was not brought to respondent's land by its own act, but came there by reason of the flooding of the creek and the breaking of the levee.

Finally, it is urged that the uncontroverted evidence establishes that respondent created and maintained a nuisance on its property, and that appellant was entitled to damages for his losses as well as an injunction restraining respondent from maintaining its land in the same dangerous condition. In *Galbreath* v. *Hopkins*, 159 Cal. 297 [113 P. 174], it was held that a nuisance *per se* was created by an upper owner who by ditches and other artificial means diverted surface waters which had accumulated in ponds on his land, onto the land of the neighbor below. The lower neighbor was held entitled to an injunction, even if no appreciable damage had yet been done, because if plaintiff permitted the diversion to continue for the statutory period, the upper owner would acquire an easement or servitude to overflow the lower land. The case is concerned only with surface waters and is not here appli-

786

cable. The case of *Snow* v. *Marian Realty Co.*, 212 Cal. 622 [299 P. 720], was a case wherein smoke from a donkey engine and sand and cement from uncovered piles were being carried by the wind to a neighboring building, discoloring it and necessitating its repainting. The court stated that the acts constituted a nuisance. The acts were also found to be in violation of city ordinances. The issuance of an injunction was not involved in the case. The authorities cited are inapplicable to the present case. There is no evidence herein to support a finding that respondent created and maintained a nuisance in the conduct of its mining operations.

We are satisfied in view of the foregoing that the findings and judgment find support in the record before us and accordingly the judgment must be affirmed.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 12, 1955. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.