[No. A039729. First Dist., Div. Four. Dec. 29, 1988.]

DONALD WEAVER et al., Plaintiffs, v.
RICHARD L. BISHOP et al., Defendants and Respondents;
NATIONAL AMERICAN INSURANCE COMPANY OF
CALIFORNIA, Intervener and Appellant.

**COUNSEL**

Hyde & Drath, John M. Drath, Kathleen Umrein and Gerald M. Lachowicz for Intervener and Appellant.

Paul G. Carey and Dickenson, Peatman & Fogarty for Plaintiffs.

James R. Donahue, Michael M. McKone and Caulfield, Davies & Donahue for Defendants and Respondents.

**OPINION**

**ANDERSON, P. J.**—This action was originally brought by Donald and Virginia Weaver to recover damages for the erosion of their property in St.

Helena. Named as defendants were respondents Richard and Wanda Bishop, who were alleged to have unreasonably altered the flow of Sulphur Springs Creek, causing damage to the Weavers' property on the opposite side of the creek. Appellant National American Insurance Company of California (NAIC) intervened in the action as subrogee of the Weavers and of the Peppertree Homeowners Association, of which the Weavers were members. According to the complaint in intervention, NAIC was subrogated to the claims against the Bishops because it had been obligated under an insurance policy to repair damage to the subrogors' property. NAIC thus stood in the shoes of the Weavers, asserting that it had been forced to repair damage for which the Bishops were liable because of their alleged diversion of Sulphur Springs Creek.

The case was tried before a jury. The evidence established that defendants placed riprap (boulders) along their banks, partly at the suggestion of Donald Weaver, to stop the ongoing washing away of the land along the creek bank. NAIC introduced expert testimony to the effect that this riprap had caused the washing away of land belonging to the Weavers and the homeowners' association.

NAIC sought to have the jury instructed that defendants were subject to liability, without regard to fault, if they obstructed and diverted the natural flow of the creek so as to damage the property of NAIC's subrogors. NAIC also sought an instruction directing the jury to find that defendants' conduct was the proximate cause of damage to NAIC's subrogors. The court refused these requests. It instructed the jury that liability depended on the reasonableness of the parties' conduct and that proximate cause was an issue for the jury to resolve.

By special verdict, the jury found that the conduct of defendants was reasonable, the conduct of NAIC's subrogors was unreasonable, and the conduct of NAIC's subrogors was a proximate cause of their damages. ▮ NAIC appeals from the resulting judgment for defendants, contending that the trial court erred by (1) making liability dependent on the reasonableness of the parties' conduct, and (2) refusing to take the issue of causation away from the jury.

## ANALYSIS

The liability of a landowner for causing harm to another by diverting or obstructing water presents one of the most confusing areas of California law. The cases have always reflected considerable confusion as to the doctrinal basis and factual prerequisites for liability. The usual formula made liability dependent on the nature of the water causing the harm: " ' "First,

one has no right to obstruct the flow onto his land of what are technically known as *surface waters*. . . . Second, one has the right to protect himself against *flood waters* . . . . and for that purpose to obstruct their flow onto his land, and this even though such obstruction causes the water to flow onto the land of another. . . . Third, one may not obstruct or divert the flow of a *natural watercourse.*" ' " (*LeBrun* v. *Richards* (1930) 210 Cal. 308, 314-315 [291 P. 825, 72 A.L.R. 336], quoting *Horton* v. *Goodenough* (1920) 184 Cal. 451, 453 [194 P. 34].) (Italics added.)

NAIC characterizes the present case as falling into the third category, i.e., obstruction or diversion of a natural watercourse. It contends that under the traditional rule governing watercourses, defendants are subject to "strict liability . . . for diversion and obstruction of a natural stream." We question this description of the traditional rule. Disputes of the present type were traditionally subject to several rules. The starting point, to be sure, was the idea that " 'the diversion of water from its natural course resulting in damage to adjacent property is actionable.' " (*Youngblood* v. *City of Los Angeles* (1958) 160 Cal.App.2d 481, 487 [325 P.2d 587], quoting *Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 283 [289 P.2d 1].) However this principle was itself promptly diverted from its seemingly straightforward course by several competing rules. A landowner was held entitled to make "improvements" to a watercourse, as by straightening, widening, or deepening it, even if the resulting increase in velocity harmed downstream lands and even if a different plan might have been available to avert the harm. (*Archer* v. *City of Los Angeles* (1941) 19 Cal.2d 19, 26 [119 P.2d 1]; see *Bauer* v. *County of Ventura, supra,* 45 Cal.2d at p. 283; *People* v. *Weaver* (1983) 147 Cal.App.3d Supp. 23, 29 [197 Cal.Rptr. 521].) An upstream owner was also entitled to drain surface waters into a stream, provided they came from within its natural watershed, even if the resulting increase in volume and velocity exceeded the stream's carrying capacity. (*San Gabriel V. C. Club* v. *Los Angeles* (1920) 182 Cal. 392, 402 [188 P. 554, 9 A.L.R. 1200]; *Archer* v. *City of Los Angeles, supra,* 19 Cal.2d at pp. 24-25, 26.) Most pertinent to the present analysis is the owner's right under the "common enemy" doctrine to build levees, bulkheads, dikes, or similar structures along the banks of a stream to confine or repel floodwater, even if the result was to flood downstream lands. (*San Gabriel V. C. Club* v. *Los Angeles, supra,* 182 Cal. at p. 400.) And this right extended not only to the prevention of inundation, but also to protecting banks from washing away.[1] (See

---

[1] This rule would seem squarely applicable to immunize defendants except for two points which are left factually, and perhaps legally, unclear: (1) the record does not clearly establish the extent to which defendants' riprap may have protruded into the channel of the stream so as to constitute an obstruction; and (2) it is unclear whether defendants were protecting themselves solely against floodwaters, or whether some of the washing away was caused by the natural flow of the creek.

*Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19, 28; *Barnes* v. *Marshall* (1886) 68 Cal. 569, 571 [10 P. 115]; *San Gabriel V. C. Club* v. *Los Angeles, supra,* 182 Cal. 392, 400; *Weck* v. *L. A. County Flood Control Dist.* (1947) 80 Cal.App.2d 182, 191 [181 P.2d 935].)

Assuming NAIC can overcome these obstacles, a question remains whether the traditional rules truly imposed strict liability, or whether they required some showing that the defendant's conduct was unreasonable or otherwise wrongful. NAIC cites no authority squarely holding that such liability is absolute; nor have we found any. In *Salstrom* v. *Orleans Bar Gold Min. Co.* (1908) 153 Cal. 551, 554-555 [96 P. 292], the court indicated that a *miner* is strictly liable for causing diversion of a stream by depositing in it large quantities of mining *debris*. Such conduct is hardly comparable to that of an owner who seeks to protect his or her banks from the depredations of an erosive stream. Likewise some cases may be read to follow a rule of strict liability where irrigation water artificially brought onto the defendant's land floods or percolates onto the plaintiff's land. (E.g., *Kall* v. *Carruthers* (1922) 59 Cal.App. 555, 562-563 [211 P. 43]; see *Parker* v. *Larsen* (1890) 86 Cal. 236 [24 P. 989].) However, in *Williams* v. *Pacific Coast Aggregates, Inc.* (1954) 128 Cal.App.2d 777, 785 [276 P.2d 28], the court declined to follow those cases and refused to apply a strict liability rule where the failure of a dike system suddenly released a mass of flood waters onto the plaintiff's property. Without squarely addressing the issue discussed here, the court approved the trial court's adoption of a negligence theory. (*Id.,* at pp. 782, 784; see also *Tahan* v. *Thomas* (1970) 7 Cal.App.3d 78, 81 [86 Cal.Rptr. 440] [under older authorities, right to obstruct flood water depends on "whether the steps taken are reasonable under all of the circumstances"]; *Jones* v. *California Development Co.* (1916) 173 Cal. 565, 574 [160 P. 823] ["underlying principle" where owner faces "extraordinary water conditions" is that "in such stress the land owner may use every reasonable precaution to avert injury"]; *The Weinberg Co.* v. *Bixby* (1921) 185 Cal. 87, 97 [196 P. 25] [defendants not liable if they "fend the intruding waters from their own premises in a reasonable and prudent manner"]; *San Gabriel V. C. Club* v. *Los Angeles, supra,* 182 Cal. at p. 401 [discussing reasonable use doctrine in context of otherwise permissible upstream drainage into watercourse]; but see *Deckert* v. *County of Riverside* (1981) 115 Cal.App.3d 885, 895-896 [171 Cal.Rptr. 865] [where surface waters from cross-defendant's land could only reach cross-complainants' land via a natural watercourse, "there is no way, . . . (cross-defendant) could ever be held liable"].)

██  In any event the court below instructed the jury on the principles announced in *Keys* v. *Romley* (1966) 64 Cal.2d 396, 408-409 [50 Cal.Rptr. 273, 412 P.2d 529], where the Supreme Court qualified the erstwhile "civil law rule" applicable to surface waters. Under that rule a landowner was

liable for any harm caused to neighboring owners by an alteration in the flow of surface waters across his or her land. The court in *Keys* declared that this strict rule must be tempered by a rule of "reasonable use," under which an owner modifying the flow of surface waters can successfully defend a claim for damages by showing that his conduct was reasonable and that of the plaintiff owner was unreasonable. (*Id.,* at p. 409; see *Burrows* v. *State of California* (1968) 260 Cal.App.2d 29, 32 [66 Cal.Rptr. 868].) Here the jury found that this situation obtained, and on that basis defendants were absolved of liability. We believe the trial court properly concluded that the "reasonable use" doctrine of *Keys* v. *Romley* applies where one landowner seeks damages for the loss of land along a stream, claiming that the loss was caused by another owner's installation of measures to protect his or her bank from being washed away.

One whose land is being washed away by a stream faces a situation much like that of an owner threatened by surface or flood waters. In all three situations the owner must either act to protect the land or else suffer its virtual or actual loss, or at least the loss of its beneficial use. All three situations are closely analogous to that of a coastal owner who can only protect himself against marine erosion by erecting groins, which may in turn divert the sea's erosive force to neighboring lands. This is the precise situation which, in England, gave rise to the "common enemy" doctrine. It was the analogy between this coastal situation and the riparian one which led the California Supreme Court to adopt the "common enemy" doctrine as the law of this state where watercourse flooding is concerned.[2] In *Lamb* v. *Reclamation Dist. No. 108* (1887) 73 Cal. 125, 130-131 [14 P. 625], the court quoted at length the opinions of the English justices in *Rex* v. *Commissioners,* 8 Barn. & C. 355, who opined that where each landowner can protect his or her own land, each owner has a right to do so. This point was expanded in *McDaniel* v. *Cummings* (1890) 83 Cal. 515, 520-521 [23 P. 795], where the court observed that an affected owner who fails to protect his or her land ought not to be allowed, on that basis, to prevent other owners from protecting theirs.

■■■ The present case, if not squarely within the traditional "common enemy" doctrine, presents a substantially identical situation. Defendants' conduct was purely defensive; both owners had the means to protect them-

---

[2]The lack of a coherent rationale for the various rules in this area is illustrated by the failure of the cases to explain why the attempts of a California landowner to ward off inundation will be judged under two or perhaps three sharply divergent rules of liability, depending on whether the inundating waters be deemed flood waters, surface waters, or "natural flow" in a watercourse. All three categories are readily analogized to the tidal waters from which the "common enemy" doctrine first emerged. Surface waters, indeed, are treated as "enemy waters" in many jurisdictions. (See *Keys* v. *Romley, supra,* 64 Cal.2d at pp. 400-401, and cases cited therein.)

selves; and the rule contended for by NAIC would have the effect of imposing on defendants the burden either of suffering the destruction of their land, or paying for the measures to protect both owners from the erosive forces of the stream.

The common enemy doctrine is one form of the "right to inflict damage," which was traditionally referred to under the law-Latin catch-phrase "damnum absque injuria" (harm without legal injury).[3] This notion, peculiar to water law, rested on the "generally perceived reasonableness" of actions taken to protect one's property and on a policy of encouraging the preservation of land resources. (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 306, 307 [90 Cal.Rptr. 345, 475 P.2d 441], fns. omitted.) However the nearly unanimous trend has been away from per se rules based on categorical judgments of "generally perceived reasonableness," and toward fact-based determinations of reasonableness in the particular circumstances of each case. Thus in *Ektelon* v. *City of San Diego* (1988) 200 Cal.App.3d 804, 810 [246 Cal.Rptr. 483], the court held that an upstream owner who increases drainage into a stream may be liable to downstream owners under "ordinary principles of negligence," despite *Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19. And while defendants might have been able to argue under the traditional common enemy doctrine that they were "privileged" to inflict the damages suffered by NAIC's subrogors, it is now held that the "common enemy" doctrine itself is qualified by a reasonableness requirement like that adopted by the trial court here. (*Linvill* v. *Perello* (1987) 189 Cal.App.3d 195 [234 Cal.Rptr. 392].)

As a general proposition, at least, this movement away from the traditional categorical rules seems inevitable given the seeming absence of any overarching rationale for those rules and the confusion they engendered on many crucial issues. It may also be supposed that they often produced harsh results, depriving one owner or the other of valuable property rights based on some arcane if not arbitrary classification of the facts. Nor could they be easily defended as possessing the virtues of certainty, predictability, simplicity, or uniformity. Often they provided no better basis for forecasting the legal consequences of a given course of conduct than if liability hinged on a jury's determination of reasonableness. The outcome might turn on the judicial characterization of the water involved, which might not readily fit

---

[3] Perhaps in no other extant body of law do Latin or quasi-Latin maxims and metaphorical labels so thoroughly obscure the underlying reasoning in the published authorities, and confound principled analysis of the issues. Another maxim common in the older cases was "[s]ic utere tuo ut alienum non laedas"—so use your own property as not to injure another's. (E.g., *Kall* v. *Carruthers, supra,* 59 Cal.App. at p. 561.) This proposition can hardly furnish a rule of decision, however; it has been justly condemned as "mere verbiage" which begs the question by assuming the point in controversy. (See Black's Law Dict. (4th ed. 1968) p. 1551.)

any of the three categories acknowledged in the rule.[4] (E.g., *Horton* v. *Goodenough, supra,* 184 Cal. at p. 458 [flood water escaped from large runoff channel into a smaller one, held still flood water and not watercourse].) Liability might also depend on characterizing the nature and purpose of defendant's conduct, such as whether the defendant had "improved" a watercourse or "obstructed" it, or whether the purpose was to ward off flood waters rather than to alter the "natural flow" of a stream. The theory of recovery chosen by the plaintiff and ultimately adopted by the court might also become a significant determining factor, since a claim might be brought in trespass or nuisance as well as under the sui generis rules of water law. Finally, a litigant could not be certain whether the court would deem conditional or defeasible whatever right or privilege might be asserted by either party.

More broadly, as *Keys* acknowledges and illustrates, the general trend in water-damage cases is to replace the rigidities of property law with the more flexible, conduct-oriented principles of tort. (See 64 Cal.2d at p. 408.) Under the latter as expressed in the Second Restatement of Torts, defendants' liability would depend on a balancing of reasonableness, either by analogy to the rules concerning interference with water use, or under the rules of nuisance and trespass. (See Rest.2d Torts, §§ 849, 850, 821D, 822, 165.)[5] This undoubtedly reflects the emerging state of the law in this field.

We conclude that the trial court properly applied the reasonableness rule of *Keys* to the facts at hand. Since no challenge is made to the sufficiency of

---

[4] Typical of the legal uncertainties inviting litigation was the seemingly self-contradictory notion that an owner had the right to confine floodwaters *within* a watercourse, when flood waters were defined as " 'those which *escape* from a stream or other body of water and *overflow* the adjacent territory [citations].' " (*LeBrun* v. *Richards, supra,* 210 Cal. 308, 315, italics added; see *Weck* v. *L. A. County Flood Control Dist., supra,* 80 Cal.App.2d at p. 193; *Keys* v. *Romley, supra,* 64 Cal.2d at p. 400.) Some courts were forced by this artificial distinction to postulate the existence of what might be called *constructive* flood water, i.e., water which *would have* escaped from its channel had it *not* been confined. (See *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 641 [220 P.2d 897].) This, of course, posed a question as to what events would have the effect of dissipating the waters' "flood" status so as to remove the protection of the common enemy doctrine. In *Beckley* v. *Reclamation Board* (1962) 205 Cal.App.2d 734, 752 [23 Cal.Rptr. 428], the court rejected an argument based on *Clement,* noting that it showed "complete enchantment with the labels 'flood waters' and 'common enemy.' " The court then reached for new metaphorical heights, observing, "[F]lood waters only remain the common enemy so long as they are *vagrant,* i.e., ' "flowing wild" over the country.' [Citation.] When the cougar roams the mountains it is every man for himself, but certainly that does not mean that one may capture the beast, bring him back to the city, then unleash him in the city park." (*Id.,* at p. 752.)

[5] The Restatement rules governing riparian rights appear inapplicable here since they concern interference with the *use* of water and NAIC sought relief for damage to the property itself. (See Rest.2d Torts, § 850, com. b [interests protected by riparian rules; washing away of land would be governed by rules on trespass]; § 847 ["Use of Water defined"]; § 821D, com. e [flooding of plaintiff's land as a trespass].)

the evidence to support the jury's findings, we must conclude that defendants were properly found not subject to liability. Accordingly, any error in the instructions concerning proximate cause was harmless—although we hasten to note that we detect no such error.

The judgment is affirmed.

Poché, J., and Perley, J., concurred.